**In re SURFACE MINING REGULATION LITIGATION (three cases).**

**Appeal of AMERICAN MINING CONGRESS et al.**

**Appeal of AMHERST COAL COMPANY et al.**

**Appeal of SUNOCO ENERGY DEVELOPMENT COMPANY.**

Nos. 78–2190 to 78–2192.

United States Court of Appeals, District of Columbia Circuit.

Argued June 5, 1979.

Decided May 2, 1980.

Rehearing Denied July 10, 1980.

Robert N. Sayler, Washington, D. C., with whom Theodore Voorhees, Jr. and Robert J. Gage, Washington, D. C., were on brief for appellants American Mining Congress and National Coal Association.

Warner W. Gardner, Washington, D. C., for appellant Peabody Coal Company.

Thomas G. Johnson, Houston, Tex., was on brief for appellant R & F Coal Company.

John L. Kilcullen, Washington, D. C., was on brief for appellant Utah International, Inc.

John A. MacLeod and Richard McMillan, Jr., Washington, D. C., were on brief for appellants Consolidation Coal Company and North American Coal Corporation.

Peter J. Nickles and Eugene D. Gulland, Washington, D. C., were on brief for appellant Sunoco Energy Development Company.

Michael A. McCord, Atty., Dept. of Justice, Washington, D. C., with whom Sanford Sagalkin, Deputy Asst. Atty. Gen., and Carl Strass, Atty., Dept. of Justice, Washington, D. C., were on brief for appellees.

Terence L. Thatcher, L. Thomas Galloway and Jonathan Lash, Washington, D. C., were on brief for appellees National Wildlife Federation, et al.

Also I. Michael Greenberger, Washington, D. C., entered an appearance for appellant in No. 78–2190.

Also James W. Moorman and Lois J. Scheffer, Attys., Dept. of Justice, Washington, D. C., entered an appearance for appellees.

Before McGOWAN, TAMM and ROBB, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

In this case we are presented with challenges to interim regulations promulgated by the Secretary of the Interior pursuant to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq. (Supp. II 1978) (Surface Mining Act or Act). Following publication of the interim regulations in final form on December 13 and 16, 1977, twenty-two complaints attacking the regulations were filed in the United States District Court for the District of Columbia [1] by coal mine operators, mining trade associations, environmental groups, and three states. The District Court rejected the attacks, and these appeals followed.[2]

## I. BACKGROUND

The Surface Mining Act was passed in the 95th Congress and signed into law by President Carter on August 3, 1977. The statute resulted from prolonged deliberation that began with hearings and the introduction of legislation in the 90th Congress.

The Act is a comprehensive statute designed to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." Section 102(a), 30 U.S.C. § 1202(a). Title II of the Act creates the Office of Surface Mining Reclamation and Enforcement (OSM) within the Department of the Interior, and the Secretary of the Interior, acting through OSM, is charged with the primary responsibility for administering and implementing the Act. Section 201, 30 U.S.C. § 1211.

The Surface Mining Act's principal regulatory and enforcement provisions are contained in Title V, which establishes a two-tiered regulatory program to achieve the purposes of the statute. The two tiers consist of an interim, or initial, regulatory program and a permanent regulatory program. Section 501(a) of the Act, 30 U.S.C. § 1251(a), requires the Secretary to promulgate interim regulations for surface coal mining and reclamation operations within ninety days of the statute's enactment. The Secretary initially proposed interim regulations on September 7, 1977, and interested persons were allowed thirty days to submit comments. 42 Fed.Reg. 44,920. Over three hundred comments were submitted, and four public hearings on the proposed interim regulations were held during the comment period. The Secretary promulgated and published final interim regulations on December 13 and 16, 1977, and the interim regulations were made effective as of those dates. Id. at 62,639 and 63,394.

Section 502(c) of the Act, 30 U.S.C. § 1252(c), delineates the performance standards that the interim regulatory program must contain. Those performance standards include, among other things, requirements for restoration of land to its prior condition after mining, restoration of land to its approximate original contour, segregation and preservation of topsoil, minimization of hydrologic disturbances from mining, construction of coal mine waste piles used as dams or embankments, utilization of explosives, revegetation of mined areas, reclamation of mountaintop mines, and spoil disposal for steep-slope mines.[3] Surface coal mining operations, excluding those on "Federal lands" or "Indian lands", commencing on or after February 3, 1978 (i. e., new mines) must comply with the provisions of the interim regulatory program when operations start; and surface coal

---

1. Section 526(a)(1) of the Act, 30 U.S.C. § 1276(a)(1), provides, in pertinent part: "Any action by the Secretary promulgating national rules or regulations including standards pursuant to sections 1251, 1265, 1266, and 1273 of this title shall be subject to judicial review in the United States District Court for the District of Columbia Circuit [sic]."

2. The decisions of the District Court are reported as *In re Surface Mining Regulation Litigation*, 452 F.Supp. 327 (D.D.C.1978) and *In re Surface Mining Regulation Litigation*, 456 F.Supp. 1301 (D.D.C.1978).

3. *See* §§ 515(b)(2), (3), (5), (10), (13), (15), (19), 515(c), and 515(d), 30 U.S.C. §§ 1265(b)(2), (3), (5), (10), (13), (15), (19), 1265(c), and 1265(d).

mining operations begun prior to February 3, 1978 are required to adhere to the interim regulations by May 3, 1978. Sections 502(b), (c) and 701(11), 30 U.S.C. §§ 1252(b), (c) and 1291(11). By February 3, 1978, the Secretary is required to implement a federal enforcement and inspection program in each state, including the examination of surface coal mines by a federal inspector once every six months. Section 502(e), 30 U.S.C. § 1252(e). During the interim phase, the Secretary and the states share responsibility for enforcement of the regulatory program. The statute contemplates that the Secretary will not issue mining permits during the interim phase, but the states may continue to issue mining permits so long as the permits mandate compliance with the requisite performance standards. Section 502(b), 30 U.S.C. § 1252(b).

The second tier of regulation contemplated by the Surface Mining Act, the permanent phase, is provided for in section 501(b), 30 U.S.C. § 1251(b), which commands the Secretary to promulgate, within one year of the statute's enactment, a permanent regulatory program establishing procedures and requirements for preparation, submission, and approval of "State programs" and for development and implementation of "Federal programs". In addition, the permanent regulations must require adherence to all provisions of Title V of the Surface Mining Act, including all the performance standards set forth in section 515, 30 U.S.C. § 1265, and not just those applicable to the interim regulatory program pursuant to section 502(c), 30 U.S.C. § 1252(c). Section 501(b), 30 U.S.C. § 1251(b).

During the permanent phase, a state may seek to assume primary jurisdiction over the regulation of surface coal mining on "non-Federal lands" within its borders by submitting a proposed "State program" of regulation to the Secretary. Section 503(a), 30 U.S.C. § 1253(a). The Secretary must .approve or disapprove a proposed "State program", in whole or in part, within six

months after the program is submitted to him. Section 503(b), 30 U.S.C. § 1253(b). If a "State program" is approved by the Secretary, that state assumes the responsibility for issuing mining permits and for enforcing the provisions of its regulatory program. However, if a state fails to submit a proposed program, fails to resubmit an acceptable program within sixty days after disapproval of its proposed program, or at any time fails to implement, enforce, or maintain an approved program in accordance with the Act, the Secretary is directed to prepare and implement a "Federal program" of regulation within that state no later than June 3, 1980. Section 504(a), 30 U.S.C. § 1254(a). When a "Federal program" is promulgated for a state, the Secretary constitutes the regulatory authority administering the Act within that state and continues as such unless and until a "State program" is approved. No later than eight months after approval of a "State program" or implementation of a "Federal program", all surface coal mining and reclamation operations on "non-Federal lands" within the state must obtain a new permit issued in accordance with the applicable regulatory program. Section 506(a), 30 U.S.C. § 1256(a).

■ The Secretary issued proposed permanent regulations on September 18, 1978, and public comments were received by OSM from September 18 to November 27, 1978. 43 Fed.Reg. 41,662. Nearly six hundred comments were submitted to the agency, and twenty-five days of public hearings were conducted during the comment period. 44 Fed.Reg. 14,908 (1979). The Secretary promulgated and published final permanent regulations under the Surface Mining Act on March 13, 1979, and the permanent regulations were made effective as of April 12, 1979. *Id.* at 14,902. Even though the permanent regulations have been published in final form, the interim regulatory program remains in effect in a given state until that state has a "State program" approved or a "Federal program" implemented by the Secretary.[4]

4. *See* section 502, 30 U.S.C. § 1252; 44 Fed. Reg. 14,907 (1979). Thus, publication of the final permanent regulations does not render appellants' challenge to the interim regulations

moot because the interim regulatory program could conceivably remain in effect in some, or all, states until June 3, 1980, the date by which a "State program" must be approved or a

As noted above, after the final interim regulations were published, numerous complaints attacking them were filed in the District Court. The court consolidated all the cases under the caption "Surface Mining Regulation Litigation", and entertained eleven motions for preliminary injunctive relief and partial summary judgment. (J.A. at 14–19) Following a hearing on these motions, the District Court issued a memorandum opinion and order on May 3, 1978. *In re Surface Mining Regulation Litigation,* 452 F.Supp. 327 (D.D.C.1978). For purposes of this appeal, the opinion contained the following relevant rulings:[5] (1) the basis and purpose statement accompanying the final interim regulations was adequate, *id.* at 333; (2) the Secretary gave due consideration to the effects of the interim regulations on the economy, inflation, and the nation's energy supply, *id.* at 334; (3) the interim regulations need not contain general variance or exemption procedures, *id.* at 338–39; (4) the scope of the interim regulations' grandfather exemption for surface mining on prime farmlands is valid, *id.* at 340; (5) the 1,000-foot limit on blasting without regulatory approval is valid, *id.* at 341–42; and (6) the interim regulations' hydrologic and water quality standards may not "supersede, amend, modify, or repeal" the provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* (1976 & Supp. II 1978), and its regulations, *id.* at 344.

Certain of the plaintiffs below immediately appealed from the District Court's rulings and moved this court for summary reversal or for an injunction pending appeal. On May 25, 1978 this court denied the plaintiffs' motions and, *sua sponte,* summarily affirmed the District Court's denial of preliminary injunctive relief. *Atlantic*

*Richfield Co. v. United States Dep't of Interior,* No. 78–1406.

On August 24, 1978 the District Court issued a second memorandum opinion and order disposing of the plaintiffs' motions for summary judgment made after the decision of May 3, 1978. *In re Surface Mining Regulation Litigation,* 456 F.Supp. 1301 (D.D.C.1978). So far as pertinent to this appeal, the District Court held: (1) as determined in its previous opinion, the procedures employed by the Secretary and the basis and purpose statement accompanying the final interim regulations were reasonable and adequate, *id.* at 1307–08; (2) the interim effluent regulations do not, in fact, impermissibly "supersede, amend, modify, or repeal" the Federal Water Pollution Control Act insofar as they fail to include variances and exemptions similar to those afforded in the Environmental Protection Agency's regulatory scheme because the absence of such provisions in the interim regulations constitutes the proper "plugging of a regulatory gap with a more stringent program" by the Secretary, *id.* at 1314–15; (3) the interim regulations' maximum limit on particle velocity for blasting operations of one inch per second is valid, *id.* at 1317; and (4) the Secretary was authorized to promulgate enforcement regulations with respect to surface mining on Indian lands, *id.* at 1324–26.

These appeals followed.[6] Appellants (Surface Miners) herein are eleven coal mining companies and trade associations[7] that in this court challenge the interim regulations under the Surface Mining Act on the three general, and five specific, grounds. Appellees herein are the United States Department of Interior, the Secretary of the Interior, and six environmental

---

"Federal program" implemented in each state pursuant to section 504(a), 30 U.S.C. § 1254(a).

**5.** The standard of review applicable to the District Court's consideration of the interim regulations is set forth in section 526(a)(1), 30 U.S.C. § 1276(a)(1), which provides, in pertinent part: "Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law."

**6.** This court's jurisdiction to entertain the appeals rests on 28 U.S.C. § 1291 (1976).

**7.** Appellants are American Mining Congress, Consolidation Coal Company, National Coal Association, Peabody Coal Company, Pennsylvania Coal Mining Association, R & F Coal Company, Texas Utilities Generating Company, North American Coal Corporation, Utah International, Inc., Amherst Coal Company, and Sunoco Energy Development Company.

and citizens groups that participated as defendant-intervenors below.[8]

## II. THE GENERAL CHALLENGES

The Surface Miners contend that the interim regulatory program suffers from three "pervasive defects" that "infect" the interim regulations as a whole and constitute grounds for invalidating them. The Surface Miners argue: (1) the Secretary failed to explain adequately the basis and purpose of the interim regulations or to identify the technical literature on which he relied; (2) the interim regulations fail to provide adequate variance procedures; and (3) the Secretary failed to make required economic and inflationary impact analyses. *See* Joint Br. for Appellants at 11–12, 14–24; Joint Rep.Br. for Appellants at 1–7.

### A. *The Adequacy of the Basis and Purpose Statement*

Section 4(c) of the Administrative Procedure Act, 5 U.S.C. § 553(c) (1976), provides that after notice of proposed rulemaking, opportunity for comment, and consideration of relevant material presented, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose." The legislative history of the Administrative Procedure Act further clarifies the requirement for a basis and purpose statement:

> Section 4(b) [subsequently section 4(c)], in requiring the publication of a concise general statement of the basis and purpose of rules made without formal hearing, is not intended to require an elaborate analysis of rules or of the detailed considerations upon which they are based but is designed to enable the public to obtain a general idea of the purpose of, and a statement of the basic justification for, the rules.

S.Rep.No.752, 79th Cong., 1st Sess. 39 (1945). This court has stated in *Automotive Parts & Accessories Ass'n v. Boyd*, 132 U.S. App.D.C. 200, 208, 407 F.2d 330, 338 (1968), that an agency is not expected "to discuss every item of fact or opinion included in the submissions made to it in informal rule making", but that a basis and purpose statement should enable a reviewing court "to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them as it did." *See also National Nutritional Foods Ass'n v. Weinberger*, 512 F.2d 688, 701 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975) (the requirement that an agency " 'incorporate in the rules a concise general statement of their basis and purpose' certainly does not require the agency to supply specific and detailed findings and conclusions of the kind customarily associated with formal proceedings"); *Amoco Oil Co. v. EPA*, 163 U.S.App.D.C. 162, 179, 501 F.2d 722, 739 (1974) (a basis and purpose statement "must be sufficiently detailed and informative to allow a searching judicial scrutiny of how and why the regulations were actually adopted"). The rationale underlying the basis and purpose statement requirement was expressed by this court in *Rodway v. United Dep't of Agriculture*, 168 U.S.App.D.C. 387, 395, 514 F.2d 809, 817 (1975):

> The basis and purpose statement is not intended to be an abstract explanation addressed to imaginary complaints. Rather, its purpose is, at least in part, to respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments, and to show how that resolution led the agency to the ultimate rule. . . . The basis and purpose statement is inextricably intertwined with the receipt of comments.

The Secretary was required to promulgate the interim regulations within ninety days of the statute's enactment, section 501(a), 30 U.S.C. § 1251(a); but despite such a statutory time constraint, the final interim regulations were accompanied by a thirty-six-page preamble explaining the basis and purpose of the interim regulatory program with considerable particularity. 42

---

**8.** The environmental and citizens groups appearing as appellees are National Wildlife Federation, Appalachian Coalition, Citizens' League to Protect Surface Rights, Council of Southern Mountains, Inc., Northern Plains Resource Council, and Virginia Citizens for Better Reclamation.

Fed.Reg. 62,639–75 (1977). The preamble consists of a detailed discussion of the public comments received on the proposed interim regulations, and reveals what modifications were made to specific regulations in light of those comments or why the agency concluded that no modifications were necessary. In addition, sections 700.2 and 710.2 of the interim regulations, 30 C.F.R. §§ 700.2 and 710.2 (1978), broadly outline the objectives of the interim regulatory program.

The Surface Miners assert that "[i]n a great many instances the Secretary completely failed to explain the rationale for, or the benefits that were expected to be achieved by, his new regulatory scheme" and that "[t]his fundamental shortcoming disabled interested members of the public from making informed comments on the basis for the purposed rules." (Joint Br. for Appellants at 15) The District Court, however, concluded that:

> The basis and purpose statement published with the regulations (1) is an adequate statement of "and why the regulations were actually adopted" . . . ; (2) sets forth "a thorough and comprehensible statement of the reasons" for the agency's decisions . . . ; (3) explains the agency's policy choices and standards . . . ; and (4) explains the agency's resolution of "significant problems raised by the comments" . . . .

Given the statutory time constraints, the basis and purpose statement sufficiently details the Secretary's actions and how the comments were considered and the problems resolved. [citations omitted]
452 F.Supp. at 333. Accord, 456 F.Supp. at 1308 ("[a]s this court indicated previously, given the statutory time constraints which required expedited rulemaking in this case, the procedures employed by the Secretary and the basis and purpose statement accompanying the regulations were reasonable and adequate").

We agree. The preamble to the final interim regulations satisfies the mandate of the Administrative Procedure Act, 5 U.S.C. § 553(c), that rules adopted incorporate "a concise general statement of their basis and purpose." The preamble thoroughly discusses the public comments received by OSM and the agency's reaction to them, and thus fulfills the requirement that a basis and purpose statement be "inextricably intertwined with the receipt of comments", Rodway v. United States Dep't of Agriculture, supra, 168 U.S.App.D.C. at 395, 514 F.2d at 817. The Surface Miners' contentions as to the adequacy of the basis and purpose statement accompanying the final interim regulations under the Surface Mining Act were properly rejected by the District Court.[9]

9. The Surface Miners also argue that "interested persons were disabled from making meaningful comments on the proposed rules because the agency at no point prior to final promulgation (in fact at no point prior to judicial review proceedings) undertook to identify the technical literature on which it relied." (Joint Rep.Br. for Appellants at 3) The Secretary has responded that the relevant portion of the sole on-going scientific study relied on was made available to the Surface Miners during the comment period after the interim regulations were proposed; that the final interim regulations and the certified index to the administrative record prepared for the District Court proceedings identified all the reference sources used by the Secretary in promulgating the interim regulatory program; and that, unlike the rules challenged in Portland Cement Ass'n v. Ruckleshaus, 158 U.S.App.D.C. 308, 486 F.2d 375 (1973), cert. denied, 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974), the interim regulations under the Surface Mining Act were not based on critical scientific tests, but, rather, on the detailed standards imposed by the statute and on commonly accepted knowledge and background literature in the public domain. Memorandum for Appellee (Secretary of Interior) in Support of Opposition to Appellants' Motions for Summary Reversal or an Injunction Pending Appeal at 19–28, Atlantic Richfield Co. v. United States Dep't of Interior, No. 78–1406 (D.C. Cir. Order dated May 25, 1978). The District Court held that "the agency's disclosure of technical literature was adequate in this case and full public participation was provided in the comment and hearing procedures." 452 F.Supp. at 333 n.6.

We will not disturb the District Court's conclusion. The Surface Miners make no showing of specific prejudice from the Secretary's rulemaking procedures. See B. F. Goodrich Co. v. Department of Transp., 541 F.2d 1178, 1184 (6th Cir. 1976), cert. denied, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 773 (1977) ("[t]he Administrative Procedure Act does not require that every bit of background information used

## B. The Failure to Provide General Variance Procedures

The second general challenge raised by the Surface Miners is that the performance standards of the interim regulations are invalid because the Secretary has failed to provide adequate variance and exemption procedures as required by "principles of administrative law and of due process." (Joint Br. for Appellants at 17–20) The District Court held, however, that the interim regulations were not required to contain a general variance mechanism. The court reasoned that "Congress made it clear that the only alternative that the [mine] operators had was to comply or not conduct operations." 452 F.Supp. at 338–39.

In *E. I. duPont de Nemours & Co. v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1976), the Supreme Court reversed a decision of the United States Court of Appeals for the Fourth Circuit remanding regulations promulgated under the Federal Water Pollution Control Act Amendments of 1972 back to the Environmental Protection Agency for inclusion of a general variance procedure for new plants. The Court of Appeals had determined that "[p]rovisions for variances, modifications, and exceptions are appropriate to the regulatory process." *Id.* at 138, 97 S.Ct. at 980. The Supreme Court stated, "The question, however, is not what a court thinks is generally appropriate to the regulatory process; it is what Congress intended for *these* regula-

tions. It is clear that Congress intended these regulations to be absolute prohibitions." [emphasis in original] *Id.*

Congressional intent with regard to general variances and exemptions was summarized as follows in the Senate Report on the bill that evolved into the Surface Mining Act:

> The Committee was adamant that there should be no broad exceptions to the vital mining and reclamation standards of this bill. To provide for unlimited exceptions would render the bill meaningless, since it would then be likely that the exceptions would become the rule. On the other hand, the Committee did recognize that there are some valid and important reasons for allowing limited variances to the prescribed standards of the bill, where such variances provide equal or better protection to the environment, and result in a higher post-mining land use. For this reason, there are two provisions in the bill which permit variances to the mining-reclamation standards of the bill.

S.Rep.No.128, 95th Cong., 1st Sess. 55 (1977). *See also* H.R.Rep.No.218, 95th Cong., 1st Sess. 115 (1977), U.S.Code Cong. & Admin.News 1977, pp. 593, 648 ("the committee rejected the notion that the [environmental] standards should be adjusted to what individual mine operators state they can or cannot afford"). Throughout the statute, Congress indicated an intent that there be no general variances or exemptions from the Act's performance standards.[10] In

by an administrative agency be published for public comment"); *Braniff Airways, Inc. v. CAB*, 126 U.S.App.D.C. 399, 412, 379 F.2d 453, 466 (1967) ("[t]he Supreme Court's opinions reflect the concern that agencies not be reversed for error that is not prejudicial"). Further, the record is replete with evidence of extensive industry participation in the entire rulemaking proceeding, *see* Memorandum for Appellee (Secretary of Interior), *supra* at 21–22, and the directive of the Administrative Procedure Act, 5 U.S.C. § 553(c) (1976), that interested persons be provided a meaningful opportunity to comment has been accomplished. Given the time limitations imposed by the Surface Mining Act, the methods employed by the Secretary in promulgating the interim regulatory program were reasonable and acceptable.

**10.** *E. g.*, (1) section 102(c), 30 U.S.C. § 1202(c), states that one of the purposes of the Surface

Mining Act is to "assure that surface mining operations are not conducted where reclamation as required by this chapter is not feasible"; (2) section 502(c), 30 U.S.C. § 1252(c), provides that "all surface coal mining operations . . . shall comply" with the performance standards of the interim regulatory program; (3) section 510(b)(2), 30 U.S.C. § 1260(b)(2), provides that "no permit . . . shall be approved unless . . . the applicant has demonstrated that reclamation as required by this chapter . . . can be accomplished under the reclamation plan contained in the permit application"; (4) section 515(a), 30 U.S.C. § 1265(a), states that permits "shall require that such surface coal mining operations will meet all applicable performance standards of this chapter"; and (5) section 522(a)(2), 30 U.S.C. § 1272(a)(2), requires that areas be designated as unsuitable for all or certain types of surface coal mining operations where "reclamation pursuant to the

fact, Congress deleted from earlier surface mining legislation a general variance provision that would have excepted mine operators from certain interim regulatory standards upon a showing that necessary equipment could not be readily obtained. *See* H.R.Rep.No.101, 94th Cong., 1st Sess. 90 (1975); H.R.Rep.No.1522, 93d Cong., 2d Sess. 18–20 (1974). Further, Congress explicitly provided for *limited* variances and exemptions in the Act where it deemed them necessary.[11] In contrast to the Surface Mining Act, section 301(c) of the Federal Water Pollution Control Act, 33 U.S.C. § 1311(c) (1976), provides a general variance mechanism from effluent limitations for all existing point sources. Thus, when Congress has intended that there be a general variance procedure it has so specified.

█ We conclude that Congress did not intend that the interim regulatory program contain general variances or exemptions, and that the Secretary has reasonably implemented the Surface Mining Act by providing only for certain limited variance mechanisms in the final interim regulations. We therefore affirm the District Court's determination that the Surface Miners' "claim that procedures for the granting of exemptions and variances from all of the regulations are necessary is without merit." 452 F.Supp. at 339.

### C. *The Failure to Make Economic and Inflationary Impact Analyses*

The Surface Miners' final attack on the interim regulatory program as a whole is that the Secretary's failure to prepare formal economic and inflationary impact analyses violated (1) section 102(f) of the Act, 30 U.S.C. § 1202(f); (2) Executive Order No. 11821; (3) Office of Management and Budget (OMB) Circular No. A–107;

and (4) the Department of Interior's own rules, and thus invalidates the interim regulations. (Joint Br. for Appellants at 20–24) The District Court, however, was "of the opinion that the Secretary gave due consideration to the effects the interim regulations would have on the economy, inflation, and the nation's energy supply as is evidenced by the basis and purpose statement and the administrative record." 452 F.Supp. at 334.

█ Section 102(f) of the Surface Mining Act, 30 U.S.C. § 1202(f), states that one of the purposes of the statute is to "assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided and strike a balance between protection of the environment and agricultural productivity and the Nation's need for coal as an essential source of energy." Section 102(f), however, is merely a specification of congressional purpose and imposes no requirement on the Secretary to draft economic and inflationary impact statements. Moreover, the strict timetable and methods established by the Act for the promulgation of interim regulations, *see* section 501, 30 U.S.C. § 1251, indicate that Congress did not intend that additional procedural burdens be imposed on the Secretary. *See* section 501(a), 30 U.S.C. § 1251(a) expressly waiving the environmental impact statement requirement of the National Environmental Policy Act of 1969 with regard to the interim regulations; and *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 546, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) holding that "Congress intended that the discretion of the *agencies* and not that of the courts be exercised in determining when extra procedural devices should be employed." [emphasis in original]

---

requirements of this chapter is not technologically and economically feasible."

**11.** In section 502(c), 30 U.S.C. § 1252(c), Congress provided a limited exemption for small operators that gives them an additional eight months to comply with the performance standards of the interim regulatory program. Congress provided limited variances, for example, in: (1) section 515(b)(12), 30 U.S.C. § 1265(b)(12) (surface mining through or near

underground mines); (2) section 515(b)(16), 30 U.S.C. § 1265(b)(16) (reclamation for combined surface and underground mining); (3) section 515(b)(20), 30 U.S.C. § 1265(b)(20) (revegetation); (4) section 515(c)(3), 30 U.S.C. § 1265(c)(3) (reclamation for mountaintop removal of overburden); (5) section 515(e), 30 U.S.C. § 1265(e) (reclamation for steep-slope mining); and (6) section 711, 30 U.S.C. § 1301 (experimental practices).

■ Executive Order No. 11821, 3A C.F.R. 203 (1974), *as amended by* Executive Order No. 11949, 3 C.F.R. 161 (1977), *reprinted in* 12 U.S.C. § 1904 note (1976), "require[s] that all major legislative proposals, regulations, and rules emanating from the executive branch of the Government include a statement certifying that the inflationary impact of such actions on the Nation has been carefully considered." OMB Circular No. A–107, which was issued to implement Executive Order No. 11821, directs agency heads to consider the effects of proposed regulations on inflation, employment, and energy supply and demand, and establishes criteria for identifying regulations that may have such an impact. In *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 236 (8th Cir. 1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976), the United States Court of Appeals for the Eighth Circuit held that "Executive Order No. 11821 was intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action" and, "therefore, that the district court erroneously set aside the revised [United States Department of Agriculture] regulations in their entirety because of alleged deficiencies in the [inflationary] impact statement." This court has also declared that executive orders without specific foundation in congressional action are not judicially enforceable in private civil suits. *See Manhattan-Bronx Postal Union v. Gronouski*, 121 U.S.App.D.C. 321, 326–27, 350 F.2d 451, 456–57 (1965), *cert. denied*, 382 U.S. 978, 86 S.Ct. 548, 15 L.Ed.2d 469 (1966) (Executive Order No. 10988). Thus, Executive Order No. 11821 and OMB Circular No. A–107 provide no basis for overturning the interim regulations.

■ The Surface Miners allege that the duty of the Secretary to make economic and inflationary impact analyses also arose from the Department of Interior's "own rules expressly incorporating OMB Circular No. A–107 and setting forth additional standards for determining whether regulations are 'major' and thus require an economic impact statement." (Joint Br. for Appellants at 21) The Secretary responds that "[t]his internal document, which sets out criteria for determining when an inflationary impact statement is appropriate, has never been formally issued." (Br. for Appellee (Secretary of Interior) at 44 n.42). Nevertheless, the preamble to the final interim regulations explains that the Secretary has determined that a formal economic impact analysis is not necessary for the initial regulatory program and that the Secretary has relied on a study compiled by the Congressional Budget Office, which was attached to the April 22, 1977 House Report of the Committee on Interior and Insular Affairs. This report analyzed the impact of the federal expenditures authorized under the Surface Mining Act on the economy and on inflation.[12] The House Committee concluded, based on the Congressional Budget Office study and on a Library of Congress study, that enactment of the statute would have "virtually no inflationary impact on the American economy." H.R.Rep.No.218, 95th Cong., 1st Sess. 147 (1977), U.S.Code Cong. & Admin.News 1977, p. 679. We agree with the District Court that "[t]he Secretary's actions in determining that the interim regulations did not constitute a 'major proposal' so as to require an economic impact statement and relying on the Library of Congress and Congressional Budget Office studies were not arbitrary, capricious or inconsistent with law." 452 F.Supp. at 334; *see note 5 supra*.

Therefore, as the District Court correctly concluded, the Surface Miners' general challenge to the interim regulatory program for failure of the Secretary to make required economic and inflationary impact analyses must be rejected.

## III. THE SPECIFIC CHALLENGES

The Surface Miners make five specific challenges to the interim regulatory pro-

---

12. 42 Fed.Reg. 62,640 (1977). The preamble stated, however, that "an economic impact analysis will be prepared for the permanent program regulations," *id.*, and such an analysis did accompany the permanent regulations when they were published in final form. 44 Fed.Reg. 14,910 (1979).

gram: (1) the 1,000-foot limitation on blasting in section 715.19(e)(1)(vii)(A) of the interim regulations is inconsistent with section 522(e)(5) of the Act; (2) the one inch per second limitation on particle velocity produced by blasting in section 715.19 (e)(2)(ii) of the interim regulations is arbitrary, capricious, and without support; (3) the grandfather exemption for surface mining on prime farmlands in section 716.7 (a)(2) of the interim regulations curtails and contradicts section 510(d)(2) of the Act; (4) the enforcement provisions with respect to surface mining on Indian lands in sections 177.112–.114 of the interim regulations usurp a decision reserved by Congress and are inconsistent with sections 710 and 523(a) of the Act; and (5) the effluent regulations of the interim program, sections 715.17(a) and 717.17(a), contradict section 702(a)(3) of the Act because they omit three vital elements of the Environmental Protection Agency's regulatory scheme under the Federal Water Pollution Control Act. (Joint Br. for Appellants at 25–69; Joint Rep.Br. for Appellants at 7–23)

### A. The 1,000-Foot Limitation on Blasting

Section 515(b)(15)(C) of the Surface Mining Act, 30 U.S.C. § 1265(b)(15)(C), directs that the regulations promulgated by the Secretary "limit the type of explosives and detonating equipment, the size, the timing and frequency of blasts based upon the physical conditions of the site . . . ." Section 522(e)(5) of the Act, 30 U.S.C. § 1272(e)(5), provides that surface coal mining operations will not be permitted "within three hundred feet from any occupied dwelling, unless waived by the owner thereof, nor within three hundred feet of any public building, school, church, community, or institutional building, public park, or within one hundred feet of a cemetery"; and section 701(28)(A) of the Act, 30 U.S.C. § 1291(28)(A), defines "surface coal mining operations" as including "the use of explosives and blasting." Section 715.19(e) (1)(vii)(A) of the interim regulations, 30 C.F.R. § 715.19(e)(1)(vii)(A) (1978), states,

however, that "[e]xcept where lesser distances are approved by the regulatory authority (based upon a preblasting survey or other appropriate investigations) blasting shall not be conducted within—1,000 feet of any building used as a dwelling, school, church, hospital, or nursing facility".[13] The issue, as the Surface Miners assert, "is whether the Secretary can thus validly expand the area forbidden to blasting from the 6.5 acres surrounding a dwelling as prescribed by the Act to the 72.4 acres as prescribed by the regulations." (Joint Br. for Appellants at 44) The District Court held that because the 1,000-foot limitation on blasting is not absolute but may be avoided by approval of the regulatory authority, "the Secretary exercised his discretion in a reasonable manner to protect the health and safety of the public and minimize property damage." 452 F.Supp. at 341–42. We disagree.

Section 515(b)(15) of the Surface Mining Act contains no provision authorizing the Secretary to prescribe distance limitations on blasting, while section 522(e)(5) explicitly fixes such a limitation at three hundred feet from a dwelling, etc. The statutory language is unambiguous, and yet the Secretary chose to regulate distances for blasting in contradiction of the Act. The legislative history of section 522(e) offers no support for the Secretary's position that the limitation of three hundred feet could be increased in the regulations to whatever distance he deemed appropriate, for the House Committee on Interior and Insular Affairs stated that "the decision to bar surface mining in certain circumstances is better made by Congress itself." H.R. Rep.No.45, 94th Cong., 1st Sess. 91 (1975). Moreover, the 1,000-foot limitation on blasting in the interim regulations is not saved because it is not an absolute prohibition and lesser distances may be approved by the regulatory authority. The law does not permit an agency to exercise powers expressly denied it by Congress if it includes a

---

**13.** Section 816.65(f) of the final permanent regulations retains the 1,000-foot blasting limitation. 44 Fed.Reg. 15,405 (1979).

variance mechanism that perhaps will be used to bring the agency's regulations within the boundaries established by the statute. *See Moore v. City of East Cleveland, Ohio,* 431 U.S. 494, 500–06, 521–22, 97 S.Ct. 1932, 1936–39, 1946–47, 52 L.Ed.2d 531 (1977) (a city ordinance forbidding all but immediate family members from living together in a single dwelling was struck down on due process grounds despite the availability of a variance procedure designed to alleviate "practical difficulties and unnecessary hardships" and "to secure the general welfare and [do] substantial justice"); *Public Utilities Comm'n of California v. United States,* 355 U.S. 534, 540–46, 78 S.Ct. 446, 450–54, 2 L.Ed.2d 470 (1958) (a California statute that conflicted with federal procurement regulations was held invalid under the supremacy clause even though its application was discretionary).

■ The Surface Mining Act simply does not contemplate, either by its terms or by implication, that the Secretary can expand the distance limitations on blasting as he has done in the interim regulatory program. Therefore, section 715.19(e)(1)(vii)(A) of the interim regulations is invalid because it is "inconsistent with law." [14]

B. *The One Inch Per Second Limitation on Particle Velocity Produced by Blasting*

Section 515(b)(15)(C) of the Surface Mining Act, 30 U.S.C. § 1265(b)(15)(C), instructs the Secretary to promulgate regulations that limit "the size, the timing and frequency of blasts based upon the physical conditions of the site." Section 715.19(e)(2)(ii) of the interim regulations, 30 C.F.R. § 715.-19(e)(2)(ii) (1978), provides:

In all blasting operations, except as otherwise stated, the maximum peak particle velocity of the ground motion in any

direction shall not exceed 1 inch per second at the immediate location of any dwelling, public building, school, church, or commercial or institutional building. The regulatory authority may reduce the maximum peak particle velocity allowed if it determines that a lower standard is required because of density of population or land use, age or type of structure, geology or hydrology of the area, frequency of blasts or other factors.[15]

A two inch per second standard for peak particle velocity, which is supported by the industry as safe practice, was announced in the proposed interim regulations, 42 Fed. Reg. 44,937 (1977), but the final interim regulations cut this standard by half to an absolute maximum of one inch per second. The Surface Miners contend that the one inch per second standard lacks adequate support and that:

The effect of the one inch per second limitation will necessarily be to force operators to reduce the size and increase the number of their blasting charges, resulting in greater difficulty in actually mining the coal and the inevitable increased safety risk to operating personnel associated with more frequent blasts.

(Joint Br. for Appellants at 56) The District Court, however, upheld the maximum peak particle velocity regulation, reasoning that "[a]lthough a more lenient standard also might be reasonable, the court cannot conclude that the Secretary's action in promulgating the regulation was arbitrary, capricious, or inconsistent with law." 456 F.Supp. at 1317. We disagree with the District Court's conclusion.

■ The Secretary relied almost exclusively on a study entitled Nicholls, *et al.,* "Blasting Vibrations & Their Effects on Structures" (United States Bureau of Mines

---

**14.** *See* note 5 *supra.* This court has stated in *Sea-Land Service, Inc. v. Kreps,* 185 U.S.App. D.C. 98, 108, 566 F.2d 763, 773 (1977), that, "In reviewing a decision of the District Court based on statutory construction . . . the role of the appellate court is to determine the proper legal premise and to correct the error, if any, of the District Judge." *Accord, Delaware & Hudson Ry. Co. v. United Transp. Union,* 146 U.S.

App.D.C. 142, 159–60, 450 F.2d 603, 620–21, *cert. denied,* 403 U.S. 911, 91 S.Ct. 2209, 29 L.Ed.2d 689 (1971).

**15.** The one inch per second maximum limit on particle velocity is preserved in virtually unchanged form in section 816.65(i) of the final permanent regulations. 44 Fed.Reg. 15,405 (1979).

Bulletin No. 656) (1971) (BOM 656) to support the maximum peak particle velocity regulation. (Br. for Appellee (Secretary of the Interior) at 93–94) One table in BOM 656 indicates that, based on an analysis of more than one hundred blasting incidents causing either "major" or "minor" property damage, "minor damage" to property was suffered in four instances at particle velocity levels between one and two inches per second. (J.A. at 169) However, BOM 656 states that:

> [A] reasonable separation between the safe and damage zones appears to be a particle velocity of 2.0 in./sec. All of the major damage points and 94 percent of the minor damage points lie above this [2.0 in./sec.] line. The only data points below the 2.0 in./sec. line are from early Bureau data which has the largest standard deviation.

(J.A. at 167) Thus, BOM 656 expressly identifies the two inch per second measure as a safe limit, as opposed to the one inch standard adopted by the Secretary, and admits that the four instances of "minor damage" below the two inch per second level derive from Bureau of Mines data with the highest probability of error. BOM 656 consequently treats those instances as *de minimis* and statistically inconclusive. In fact, such damage may have been "induced by mechanical means" and not even caused by blasting. (J.A. at 157) The Secretary has failed to demonstrate that the four "minor damage" points on which he relies constitute an adequate basis for a regulation of national scope that contradicts the explicit conclusions of those who conducted the Bureau of Mines study. Far from supporting

section 715.19(e)(2)(ii) of the interim regulations, BOM 656 looks in the other direction and argues convincingly for a two inch per second maximum limit on particle velocity produced by blasting.

Consequently, we hold that the interim regulatory program's peak particle velocity standard of one inch per second in section 715.19(e)(2)(ii) lacks necessary substantiation and is invalid because it is "arbitrary and capricious".[16]

### C. The Grandfather Exemption for Surface Mining on Prime Farmlands

With regard to permit requirements for surface coal mining on prime farmlands, section 510(d)(2) of the Act, 30 U.S.C. § 1260(d)(2), provides that, "Nothing in this subsection shall apply [1] to any permit issued prior to August 3, 1977, or [2] to any revisions or renewals thereof, or [3] to any existing surface mining operations for which a permit was issued prior to August 3, 1977." Section 716.7(a)(2) of the interim regulations, 30 C.F.R. § 716.7(a)(2) (1978), states, however, that:

> The requirements of this section [concerning surface coal mining on prime farmlands] are applicable to any permit issued on or after August 3, 1977. Permits issued before that date and revisions or renewals of those permits need not conform to the provisions of this section regarding actions to be taken before a permit is issued. Permit renewals or revisions shall include only those areas that—
>
> (i) Were in the original permit area or in a mining plan approved prior to August 3, 1977; or

---

**16.** *See* note 5 *supra* ; *National Ass'n of Food Chains, Inc. v. ICC,* 175 U.S.App.D.C. 346, 356, 535 F.2d 1308, 1318 (1976) (a reviewing court would be "irresponsible . . . to affirm agency action when no rational basis [for that action] is apparent").

We conclude, in accordance with the function of a second reviewing court as suggested by *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 491, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951), that the District Court "misapprehended or misapplied" the arbitrary and capricious standard of review that section 526(a) of the Act, 30 U.S.C. § 1276(a), directs it to employ; and that, given the significant effect of the maxi-

mum peak particle velocity regulation on the surface mining industry and the total absence of support for the one inch per second limit embraced by the Secretary, we must reverse the District Court and invalidate section 715.19 (e)(2)(ii) of the interim regulations.

The Surface Miners also allege that "the Secretary failed to give the public an effective opportunity to comment on BOM 656 as required by law." (Joint Br. for Appellants at 59) We need not address this procedural challenge because of our determination that the disputed interim regulation itself is without support in the record and therefore arbitrary and capricious.

(ii) Are contiguous and under State regulation or practice would have normally been considered as a renewal or revision of a previously approved plan.[17]

The Surface Miners assert that "[t]he regulation simply cuts off the statutory exemption with the first and second categories, and gives no recognition to the statutory exemption of 'existing surface mining operations' based upon a pre-enactment permit but which were neither in the original permit area nor any revision or renewal thereof." (Joint Br. for Appellants at 38) The District Court rejected the Surface Miners' argument, holding that:

The regulation is a reasonable exercise of the Secretary's discretion in implementing the statute. The regulation properly limits the scope of the grandfather provision . . . . Without this limitation, the exemption could be extended to include mine expansions and additions clearly beyond Congress' intent to exempt pre-existing, on-going mines.

452 F.Supp. at 340. We cannot accept the District Court's resolution of the issue.

The legislative history of the Act generally supports the Surface Miners' position. The provisions of the statute concerning surface mining on prime farmlands appeared as floor amendments after both the Senate and House committees had reported the bill that was finally enacted. The grandfather clause originally included in the Senate amendment was confined to existing permits and revisions or renewals thereof, 123 Cong.Rec. S7870 (daily ed. May 18, 1977), but the grandfather exemption eventually presented to, and adopted by, the Senate was identical to the one enacted by Congress. *Id.* at S8103–13 (daily ed. May 20, 1977). Senator Bayh later clarified the change in the prime farmland grandfather rights, as follows:

As originally introduced, this exemption from a special review process would have treated Indiana inequitably, because under Indiana State law technically there are only new annual permits and no re-

newals, even though operators meeting the conditions of their permit routinely get a new or renewed permit upon application.

I was very gratified that the author of the prime farmland amendment, my distinguished colleague, Senator Culver of Iowa, modified his prime farmland amendment at my suggestion, to give ongoing Indiana stripping operations the same protections afforded operations in other States despite the unusual procedures mandated by our State's law.

*Id.* at S8802 (daily ed. May 26, 1977). In contrast to the Senate, the House rejected an amendment containing a grandfather exemption limited to mining operations covered by existing permits and "any revisions or renewals thereof including those authorizing contiguous expansion of such permitted areas." *Id.* at H3772–76 (daily ed. April 28, 1977). The Conference Committee accepted the language of the grandfather clause in the Senate amendment, and its report expressed a desire "to assure continued operation of ongoing mines." H.R.Rep. No.493, 95th Cong., 1st Sess. 105 (1977). During the Senate debate on the Conference Committee Report, Senator Metcalf agreed with Senator McClure's statement that "the exclusion will apply to continued operation of an on-going mine beyond the acreage and time covered in the existing permit at the time of the enactment of the act, just so long as the continuance does, in fact, constitute a continued operation of an ongoing mine." 123 Cong.Rec. S12,442 (daily ed. July 20, 1977). During the House debate, however, inconsistent explanations of the grandfather exemption were offered. Congressman Ruppe elucidated the grandfather clause in the same terms used by Senator McClure, *id.* at H7591 (daily ed. July 21, 1977), but Congressman Tsongas, with the approval of Congressman Udall, had previously stated that "the conferees never contemplated that such grandfathered operations would be given the right

---

17. When promulgated, section 785.17 of the permanent regulations contained a more restrictive definition of grandfather rights. 44 Fed.Reg. 15,373–74. However, this provision of the permanent regulations was suspended by action of the Secretary on December 31, 1979. *Id.* at 77,454–55.

of contiguous or noncontiguous expansions that were not specified or authorized in the originally approved and grandfathered permits." *Id.* at H7588–89.

The statement of Congressman Tsongas directly conflicts with other indications in the legislative history of the development of the grandfather exemption and also contradicts the express words of the statute insofar as he omits reference to permit "revisions or renewals". We believe that the interpretations of the grandfather clause expressed in the Senate are better evidence of its true meaning than the inconsistent pronouncements in the House because the prime farmland grandfather rights included in the Surface Mining Act originated in the Senate, where the explanations of the exemption were coherent and compatible.

■■■■ The general rule is that legislative debates "are not a safe guide . . . in ascertaining the meaning and purpose of the law-making body" because they are merely "expressive of the views and motives of the individual members." *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474, 41 S.Ct. 172, 179, 65 L.Ed. 349 (1921); *see generally* 2A Sutherland, Statutory Construction § 48.13 (4th ed. 1973). It is, however, a fundamental principal of statutory construction that " 'effect must be given, if possible, to every word, clause and sentence of a statute' . . . so that no part will be inoperative or superfluous, void or insignificant." 2A Sutherland, *supra* at § 46.06. Section 510(d)(2) of the Act grandfathers pre-enactment permits, revisions or renewals of such permits, and "existing surface mining operations" for which a pre-enactment permit was issued; yet section 716.7(a)(2)(ii) of the interim regulations extends the grandfather exemption only to areas included in pre-enactment permits or mining plans and areas that "would have normally been considered as a renewal or revision of a previously approved plan." In addition, in those states that do not issue permit renewals or revisions, the regulation apparently provides grandfather protection only to areas covered by pre-existing permits, *see* Joint Reply Br. for Appellants at 14 n.20. This is so because it is apparently impossible to determine what "would have

normally been considered as a renewal or revision" in states that do not renew or revise mining permits. The third category under the Act's grandfather clause, however, was added to the Senate amendment for the very purpose of insuring the exemption and continuous operation of surface coal mines on prime farmlands in states, like Indiana, that issue permits for one or more years but do not issue renewed or revised permits. *See* 123 Cong.Rec. S8802 (daily ed. May 26, 1977). This third category can only have meaning apart from the first two if it is interpreted, as the Surface Miners contend, as grandfathering existing surface mining operations which are based on a pre-enactment permit but which were neither explicitly covered by the permit nor any renewal or revision thereof. Thus, the Secretary has impermissibly curtailed the Surface Mining Act's grandfather clause in section 716.7(a)(2) of the interim regulations, the operation of which is ambiguous at best, because he has rendered the third phrase of the exemption "inoperative" and "superfluous".

The Secretary, and the District Court as well, express concern that "[w]ithout some meaningful limitation on what constitutes a continuance of an ongoing mine, it is quite possible that a large loophole in the prime farmlands requirements could be created" so that an operator could "claim that mining on all adjacent and nearby areas constituted continuances of the existing mine to such an extent that an entire portion of a state might be grandfathered" even though "it was not originally contemplated that the area[s] would be part of the same mine." (Br. for Appellee (Secretary of the Interior) at 77 & n.79); *see also* 452 F.Supp. at 340. The Surface Miners respond that "[t]his is an absurdity" because they are claiming "grandfather exemption only for the continued and contiguous operation of the same ongoing mine along its seam." (Joint Reply Br. for Appellants at 15) We believe that the anxiety of the Secretary and the District Court is unfounded and that the Surface Miners' interpretation of the grandfather clause is reasonable and in keeping with the intent of Congress.

Therefore, we hold invalid section 716.7 (a)(2) of the interim regulations insofar as it improperly reduces the prime farmland grandfather rights established by section 510(d)(2) of the Act. The regulation is "inconsistent with law."[18]

## D. *The Enforcement Provisions Regarding Surface Mining on Indian Lands*

Section 710 of the Surface Mining Act, 30 U.S.C. § 1300, provides, in pertinent part:

(a) The Secretary is directed to study the question of the regulation of surface mining on Indian lands which will achieve the purpose of this chapter and recognize the special jurisdictional status of these lands. In carrying out this study the Secretary shall consult with Indian tribes. The study report shall include proposed legislation designed to allow Indian tribes to elect to assume full regulatory authority over the administration and enforcement of regulation of surface mining of coal on Indian lands.

(b) The study report required by subsection (a) of this section together with drafts of proposed legislation and the view of each Indian tribe which would be affected shall be submitted to the Congress as soon as possible but not later than January 1, 1978.

(c) On and after one hundred and thirty-five days from August 3, 1977, all surface coal mining operations on Indian lands shall comply with requirements at least as stringent as those imposed by [the performance standards of the interim regulatory program] and the Secretary shall incorporate the requirements of such provisions in all existing and new leases issued for coal on Indian lands.

(d) On and after thirty months from August 3, 1977, all surface coal mining operations on Indian lands shall comply with requirements at least as stringent as those imposed by [the performance standards of the permanent regulatory program] and the Secretary shall incorporate the requirements of such provisions in all existing and new leases issued for coal on Indian lands.

Moreover, Section 523(a) of the Act, 30 U.S.C. § 1273(a), states that "except as provided in section 1300 of this title the provisions of this chapter shall not be applicable to Indian lands." As of the date this case was argued, the Secretary had not yet made his report to Congress as required by section 710(a). The Secretary, however, has incorporated the requirements of the interim regulations into the leases permitting surface coal mining on five Indian reservations, and he has promulgated regulations, 25 C.F.R. §§ 177.112–.114 (1977),[19] which make the enforcement provisions of the interim regulatory program directly applicable to mining operations on Indian lands. The Surface Miners argue that, with respect to Indian lands, the Secretary lacks congressional authorization to enforce the interim program's performance standards directly and that, in doing so, he has usurped a decision reserved to Congress, which in turn awaits the Secretary's report. (Joint Br. for Appellants at 61–69) The District Court upheld the Secretary's action in promulgating the enforcement regulations, stating that:

The Secretary's interpretation is . . . supported by the fact that the requirement of § 710(c) that the operators "shall comply with requirements" would be an

---

**18.** *See* notes 5 and 14 *supra.* Our disposition of this issue reflects the recognition of Congress in section 510(d)(2) of the Act that when the statute was enacted, existing operators on prime farmlands had already made large investments in reliance on the requirements in effect at the time and that such existing mines should continue in operation independent of the fortuitous nature of the states' permit machinery.

**19.** These regulations implementing section 710(c) of the Surface Mining Act were published in final form on December 16, 1977. 42 Fed.Reg. 62,394–410.

The preamble to the Secretary's final permanent regulations states that, "Surface coal mining operations on Indian lands are not regulated under the permanent regulatory program. Regulations which currently apply to surface coal mining operations on Indian lands . . . are found at 25 C.F.R. Part 177." 44 Fed.Reg. 14,907 (1979).

empty mandate if the Secretary lacked the authority to enforce the requirements. Under the [Surface Miners'] construction of the Act, neither the Secretary, nor the states, nor the Indian tribes would have the power of enforcement to exact compliance with the requirements of the regulations.

456 F.Supp. at 1325.

The legislative history of the Surface Mining Act sheds some light on this issue. The statutory provisions with respect to Indian lands were fashioned in the 93d Congress and were carried forward, with continual reexamination but without significant change, into the Act. The Senate Committee on Interior and Insular Affairs reported S. 425 on September 21, 1973, and explained, concerning section 403's requirement that the Secretary conduct a study, that:

In the case of mining operations on Indian lands, the Committee was requested by representatives of a number of affected tribes, to postpone Federal regulation of mining on Indian lands until greater consultation could be sought from the tribes, giving them an opportunity to design mining and reclamation programs for their own lands. The bill therefore also provides for a study by the Secretary of the Interior, to examine the question of applying the provisions of the Act to Indian lands. . . .

As introduced, S. 425 directed the Secretary of the Interior to regulate surface mining of Indian lands, as well as Federal lands. During its deliberations on the bill, the Committee initially decided to give the Indian tribes the opportunity to develop their own regulatory programs in much the same manner as the States. However, since no Indian testimony was taken during the Committee's hearings, nor did the Department of the Interior address itself to the effect of regulation or how Indian tribal governments could participate, the Committee decided to exempt temporarily all Indian lands from the Act.

The Committee intends to have hearings on this subject as soon as the study report called for by this section has been received. These hearings will give Indians an opportunity to express their views and give their recommendations directly to Congress. *In the interim, the Committee expects the Secretary of the Interior to protect the surface values of all Indian lands from the potential ravages of surface mining through his authority to approve all mineral leases and permits. The Committee expects that the Secretary will include terms and conditions in such leases which will meet the criteria set out in this Act.* [emphasis added] S.Rep.No.402, 93d Cong., 1st Sess. 40, 74 (1973). On May 30, 1974, the House Committee on Interior and Insular Affairs reported H.R. 11500, Title III of which made elaborate provision for tribal enforcement on Indian lands. The Conference Committee adopted the Senate approach with certain revisions, such as the inclusion of substantive requirements for surface mining on Indian lands, and its report stated:

The Senate bill provided for a study of the question of regulating surface coal mining on Indian lands. The House amendment contained a separate title addressing regulation of surface coal mining on Indian lands. Under this provision, Indian tribes were to be treated as are States under the Act in that a tribe could elect to become the regulatory authority for the purpose of enforcement of the Act or could choose to allow the Secretary to administer the program for the tribe.

The conferees chose to provide for a study of the issues involved in implementing a full regulatory program on Indian lands rather than adopting a regulatory scheme which could be implemented by the tribe under the approved provision. . . . *The provision approved by the conferees also requires operations on Indian lands to comply with requirements at least as stringent as the full program's provisions by 30 months after enactment. These are the same time periods as are applicable for non-Indian lands. The Secretary is to enforce these provisions as well as incorporate such standards into existing and new leases.* [emphasis added]

H.R.Rep.No.1522, 93d Cong., 2d Sess. 81 (1974). The language of this Conference Committee Report, which is echoed in H.R. Rep.No.218, 95th Cong., 1st Sess. 133 (1977), accompanying the version of section 710 eventually enacted by Congress, suggests, at least with regard to the permanent regulatory program, that the Secretary must not only incorporate the performance standards into the leases, but must also "enforce" those standards. While the Conference Report admittedly makes reference only to enforcement of the permanent program's requirements pursuant to section 710(d), there is no reason to assume a different congressional intent concerning the interim program's standards; the operative language of sections 710(c) and (d) is virtually identical and the Conference Committee drew no distinction between the interim and permanent provisions with regard to enforcement. Interpreting the Act's legislative history as affording the Secretary power to enforce directly the performance standards of the permanent regulatory program but not the requirements of the interim program would be unreasonable. Further, the Surface Miners' reliance on the Senate Report accompanying S. 425 is misplaced because that bill contained only a requirement that the Secretary study the question of regulating surface mining on Indian lands. The language that became section 710(c) was not inserted into S. 425 until the bill reached the Conference Committee, so it is understandable that the Senate Committee made no mention of direct enforcement mechanisms in its report.

Section 710(c) of the Act does not expressly deny direct enforcement authority to the Secretary, but merely states that surface miners operating on Indian lands must comply with the requirements of the interim regulatory program and directs the Secretary to incorporate those requirements into all existing and new coal mining leases. The legislative history of section 710(c),

while not dispositive, strongly indicates that the Secretary has the direct enforcement powers he claims.[20] In addition, as the Secretary convincingly argues, "[u]nder the Surface Miners' theory, minor or major infractions of the performance standards could only be remedied, if at all, by the drastic measure of revoking or suspending the operator's permit or lease" whereas at least with direct enforcement "an entire range of sanctions is available to induce compliance with the standards." (Br. for Appellee (Secretary of the Interior) at 105) Moreover, although the Secretary's failure to report to Congress as required by section 710(a) might suggest neglect of his statutory duties,[21] nothing in the Act itself or the legislative history indicates that making the report is a prerequisite to direct enforcement of the interim regulations on Indian lands. A decision by Congress to give Indian tribes full regulatory authority over surface coal mining on their lands would indeed render the challenged regulations highly suspect. Nevertheless, until such a decision is made, we cannot say that the Secretary is limited to applying the Act to surface coal mining operations on Indian reservations only through the leases permitting such mining.

Thus, we agree with the District Court that "[a]lthough the [Surface Miners'] view of the statutory scheme appears to have some merit in light of the ambiguities of the Act, the court is unable to find the Secretary's actions in interpreting and implementing the Act arbitrary, capricious, or inconsistent with law." 456 F.Supp. at 1324–25. The enforcement regulations, 25 C.F.R. §§ 177.112–.114 (1979), are valid because they comport with the intent of Congress and fulfill the mandate of section 710(c) of the Act that surface coal mining operations on Indian lands be in full compliance with the performance standards of the interim regulatory program.

**20.** The Surface Miners fail even to discuss, let alone refute, the Conference Committee Report relied on by the Secretary as support for his authority to promulgate the enforcement regulations. *See* Joint Reply Br. for Appellants at 22–23.

**21.** It should be noted that the Secretary's noncompliance with section 710(a) is a matter between the Secretary and the Congress and is not a direct issue in this case because no relief compelling the report to be made is sought by the Surface Miners.

E. *The Interim Effluent Regulations*

Section 702(a)(3) of the Surface Mining Act, 30 U.S.C. § 1292(a)(3), provides that, "Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing . . .—. . . The Federal Water Pollution Control Act (79 Stat. 903), as amended (33 U.S.C. 1151–1175), the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality." Section 515(b)(10) of the Act, 30 U.S.C. § 1265(b)(10), states:

> General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as a minimum to—minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated off-site areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation . . ..

Pursuant to section 515(b)(10), the Secretary promulgated sections 715.17(a) and 717.17(a) of the interim regulations, 30 C.F.R. §§ 715.17(a) and 717.17(a) (1979), which established effluent limitations and water quality standards for surface and underground mining. The Surface Miners allege that these interim effluent regulations substantially conform to Environmental Protection Agency (EPA) practice under the Federal Water Pollution Control Act but omit three "vital" elements of the EPA's regulatory framework: (1) a variance mechanism under which effluent limits may be modified for particular mining operations upon a showing of good cause; (2) an exemption from effluent limits for discharges attributable to abnormal natural runoff, especially snowmelt; and (3) an exemption or "credit" in measuring discharges of suspended solids for the quantum of suspended solids discharged from the mine area attributable to natural or other causes unconnected with mining operations. The Surface Miners view this omission of the three substantive elements of EPA regulation as an unlawful "modification" or "repeal" of the Federal Water Pollution Control Act in violation of section 702(a)(3) of the Surface Mining Act. (Joint Br. for Appellants at 25–35) The District Court initially enjoined the interim effluent regulations "to the extent that they supersede, amend, repeal or modify the provisions of the [Federal Water Pollution Control Act] and its regulations." 452 F.Supp. at 344. In its second memorandum opinion, however, the District Court ruled that the variances and exemptions contained in the EPA regulatory program under the Federal Water Pollution Control Act constitute "the absence of regulation" or "a regulatory gap" which the Secretary can fill with more stringent provisions without breaching section 702(a)(3) of the Surface Mining Act. 456 F.Supp. at 1313–15.

The legislative history of the Surface Mining Act illustrates to what extent Congress authorized the Office of Surface Mining to regulate the hydrologic impact of mining operations. The House Committee on Interior and Insular Affairs explained that:

> The EPA has been directed by the Congress to ensure the environmental well-being of the country. EPA has established water quality standards, air quality standards, and implementation and compliance requirements for the coal mining and processing industry, and issues permits to the industry to ensure appropriate pollution abatement and environmental protection. *The committee concluded that because of the likeness of EPA's abatement programs and the procedures, standards, and other requirements of this bill, it is imperative that maximum coordination be required and that any risk of duplication or conflict be minimized.* [emphasis added]

H.R.Rep.No.45, 94th Cong., 1st Sess. 134 (1975). Thus, Congress meant exactly what it said in section 702(a)(3) of the Act, that where there is an overlap of regulation the Surface Mining Act is not to be interpreted as altering in any fashion the Federal Water Pollution Control Act. The Secretary argues that section 702(a)(3) is merely a "savings clause" to prevent the Federal Water Pollution Control Act from being weakened or nullified by passage of the Surface Mining Act and, consequently, that

he *must* promulgate effluent regulations at least as stringent as those of the EPA but he *may* promulgate more stringent provisions. (Br. for Appellee (Secretary of the Interior) at 53–62). We note however, that where Congress intended in the Act that regulation be "at least as stringent as" some other requirement it explicitly used those terms, *see* sections 710(c) & (d), 30 U.S.C. §§ 1300(c) & (d) ("all surface coal mining operations on Indian lands shall comply with requirements at least as stringent as . . . "), but section 702(a)(3) of the Surface Mining Act contains an absolute prohibition against "superseding, amending, modifying, or repealing" the Federal Water Pollution Control Act. Congress certainly recognized in the Surface Mining Act that the EPA's existing regulatory authority under the Federal Water Pollution Control Act was deficient with respect to surface coal mining, in that EPA could not directly regulate discharges from abandoned and underground mines or from nonpoint sources (i. e., discharges not emanating from a "discernible, confined, and discrete conveyance"). Congress also knew that EPA lacked statutory authority to establish standards "requiring comprehensive preplanning and designing for appropriate mine operating and reclamation procedures to ensure protection of public health and safety and to prevent the variety of other damages to the land, the soil, the wildlife, and the aesthetic and recreational values that can result from coal mining." H.R. Rep.No.45, *supra* at 134. The Act gave the Secretary authority to regulate in these areas because the Federal Water Pollution Control Act was silent in regard to them, but where the Secretary's regulation of surface coal mining's hydrologic impact overlaps EPA's, the Act expressly directs that the Federal Water Pollution Control Act and its regulatory framework are to control so as to afford consistent effluent standards nationwide.

■ It follows that we agree with the District Court that the interim effluent regulations cannot stand "to the extent that they supersede, amend, repeal, or modify the provisions of the [Federal Water Pollution Control Act] and its regulations," 452 F.Supp. at 344; and we also agree that where the Federal Water Pollution Control Act and its underlying regulatory scheme are silent so as to constitute an "absence of regulation" or a "regulatory gap", the Secretary may issue effluent regulations without regard to EPA practice so long as he is authorized to do so under the Surface Mining Act. However, we cannot accept the District Court's conclusion that the omitted elements of EPA regulation at issue here constitute such a "regulatory gap" as to allow the Secretary to promulgate more stringent requirements.

■ First, in its "Coal Mining Point Source Category" regulations EPA permits a variance from numerical effluent limitations where special need is demonstrated because "[i]t is . . . possible that data which would affect these limitations have not been available and, as a result, these limitations should be adjusted for certain plants in this industry." 40 C.F.R. §§ 434.22, .32, and .42 (1978). For example, where safety considerations conflict with effluent limits, EPA has indicated that the numerical effluent standards should give way:

> Should any evidence be submitted to the Agency to indicate that the impoundment facilities needed to meet these regulations would necessitate construction of a structure which would violate safety standards set out by a State or Federal Agency, EPA will consider the granting of a variance on an expedited basis. Under no circumstances will an owner or operator be required to violate applicable safety standards in order to meet these regulations.

42 Fed.Reg. 21,381 (1977). Such a variance mechanism is not present in the interim regulatory program under the Surface Mining Act.[22] The Secretary asserts that the variance procedure is not required because Congress did not intend that there be gen-

---

22. Such a variance procedure is also absent from section 816.42 of the final permanent reg-

ulations. 44 Fed.Reg. 15,398 (1979).

eral variances from the Act's performance standards, see Part II(B) of this opinion, and the EPA provision is applicable only to existing, as opposed to new, point sources. (Br. for Appellee (Secretary of the Interior) at 63–64) Despite any congressional aversion to general variances, however, the Surface Mining Act explicitly prohibits a "modification" or "repeal" of the Federal Water Pollution Control Act and its regulations. Thus, to the extent that the EPA variance from effluent limits applies to surface coal mining operations, it must be included in the Secretary's interim regulations in order to avoid inconsistent water quality standards in contravention of section 702(a)(3) of the Surface Mining Act.

 Second, at the time the interim regulations were promulgated EPA provided an exemption from its effluent requirements for overflows from control facilities constructed, in conformance with EPA standards, to contain a 10-year, 24-hour precipitation event (i. e., the heaviest precipitation expected to occur over a 24-hour period during a decade based on National Weather Service data). 40 C.F.R. §§ 434.22(c), .32(b), and .42(b) (1978). The Surface Miners allege that in sections 715.17(a) and 717.17(a) of the interim regulations "OSM exempts only those overflows which the operator can prove actually result from a single precipitation event that is greater than a 10-year, 24-hour event" whereas "EPA exempts *all* overflows from a design facility,"[23] and OSM limits the exemption to overflows caused by rainfall whereas EPA excludes overflows from all causes, including snowmelt. (Joint Br. for Appellants at 27) This issue has been mooted by the Secretary's publication on December 31, 1979 of a notice suspending 30 C.F.R. §§ 715.17(a)(1) and 717.17(a)(3)(i), which set forth a rainfall

exemption for the interim regulatory program, insofar as they apply to discharges of total suspended solids. 44 Fed.Reg. 77,447 (1979). In addition, the Secretary has stated that during the time future rulemaking is being undertaken, "OSM will authorize the award of exemptions from the total suspended solids effluent limits by using the appropriate elements of USEPA's revised precipitation event exemption regulations, 40 C.F.R. §§ 434.22(c), 434.25(c), 434.32(b), 434.35(b), 434.42(b), 434.45(b), as amended [on December 28, 1979]." *Id.* at 77,448.[24] We emphasize that pursuant to section 702(a)(3) of the Act the interim regulatory program's exemption for unusual precipitation events must not conflict with the effective EPA provisions as they apply to surface mining operations.

 Third, the EPA, in assessing compliance with its effluent limits, measures suspended solids in streamflow or runoff on a "net-gross" basis by offering an exemption or "credit" for pollutants already present in intake water. 40 C.F.R. § 125.28 (1978). The Secretary's interim effluent regulations measure suspended solids on a "gross" basis, however, and give no such exemption for discharged pollutants attributable to causes other than mining.[25] The Secretary alleges that the "net-gross regulations [of the EPA] do not apply to surface coal mining" so he is not required to insert identical provisions into the interim regulatory program under the Surface Mining Act. (Br. for Appellee (Secretary of the Interior) at 67–69) Although the issue is not clear, to the extent that EPA affords an exemption to surface mining operations for pollutants already in water when it comes

---

**23.** The Secretary's exemption for catastrophic precipitation events in sections 816.42(b)(1) & (2) of the permanent regulatory program is similar in that it requires a mine operator to establish that the discharge actually "resulted from a precipitation event equal to or larger than a 10-year 24-hour precipitation event" and that the discharge "is from facilities designed, constructed, and maintained in accordance with [these regulations]." 44 Fed.Reg. 15,398 (1979).

**24.** Sections 816.42(b)(1) & (2) of the permanent regulations have also been suspended. *See* note 23 *supra*.

**25.** Section 816.42(a)(7) of the final permanent regulations sets effluent standards on a "gross" basis without adjustment for pre-existing pollutants, as well. 44 Fed.Reg. 15,398 (1979).

onto the mine site, such a provision must be incorporated into sections 715.17(a) and 717.17(a) of the interim regulations so as to fulfill the mandate of section 702(a)(3) of the Surface Mining Act that the Federal Water Pollution Control Act not be "modified" or "repealed" by the Surface Mining Act.[26]

■ We hold that the EPA variances and exemptions at issue here are substantive elements of regulation under the Federal Water Pollution Control Act, and not "gaps" in EPA's statutory authority or administration, and that the Secretary, pursuant to section 702(a)(3), may not alter these variances and exemptions by promulgating more stringent provisions insofar as the variances and exemptions apply to surface coal mining operations. Thus, sections 715.17 (a) and 717.17(a) of the interim regulations are "inconsistent with law"[27] if they do, in fact, conflict with EPA practice. Because there is great confusion as to what the EPA standards are and whether they are even relevant to surface mining, and because the District Court found it unnecessary to address such specifics under its view of section 702(a)(3), we remand to the District Court the issues of a general variance from numerical effluent limitations and the measurement of suspended solids in evaluating compliance with effluent limits. The District Court will determine whether the provisions sought by the Surface Miners are applied by EPA to coal mines and must,

consequently, become part of the Secretary's interim regulatory program.

## IV. CONCLUSION

For the foregoing reasons, we affirm the District Court's rejection of the Surface Miners' three general challenges to the interim regulations as a whole and specific challenge to the enforcement regulations concerning surface mining on Indian lands. We reverse the District Court, however, as to the 1,000-foot distance limitation on blasting, the one inch per second maximum limitation on peak particle velocity produced by blasting, and the grandfather exemption for surface mining on prime farmlands; and we hold invalid those provisions of the interim regulatory program. Finally, we remand the issue of the interim effluent regulations to the District Court for proceedings, as detailed above, not inconsistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

**26.** The Surface Miners also contend that, apart from EPA practice, "net-gross" regulation of effluents is required by section 515(b)(10)(B)(i) of the Act, 30 U.S.C. § 1265(b)(10)(B)(i), which provides that surface coal mining operations must be conducted "so as to prevent, to the extent possible using the best technology currently available, *additional contributions of suspended solids to streamflow, or runoff outside the permit area . . ..*" [emphasis added] The language of section 515(b)(10)(B)(i), the Surface Miners argue, evidences a congressional purpose "to control suspended solids contributed by the mining operation, and not suspended solids already present in the water flowing across mine sites from natural or other non-mining sources." (Joint Br. for Appellants at 31) Under the Surface Miners' view, even if

EPA practice is to measure suspended solids on a "gross" basis with respect to coal mines, *see* 40 C.F.R. § 124(c) (1978), OSM must nevertheless use a "net-gross" standard, which would lead to higher concentrations of pollutants being discharged from mine sites than are anticipated under the Federal Water Pollution Control Act. However, section 515(b)(10)(B)(i) expressly states that "in no event shall contributions [of suspended solids] be in excess of requirements set by applicable State or Federal law . . .." We, therefore, reject the suggestion that section 515(b)(10)(B)(i) serves as a separate basis apart from section 702(a)(3) for requiring "net-gross" regulation of effluents by OSM.

**27.** *See* notes 5 and 14 *supra.*