PEABODY COAL COMPANY, Plaintiff,

v.

James WATT, Secretary of
Interior, Defendant.

NATIONAL COAL ASSOCIATION and
American Mining Congress, Plaintiffs,

v.

James WATT, Secretary of
Interior, Defendant.

NATIONAL WILDLIFE FEDERATION,
et al., Plaintiffs,

v.

James G. WATT, et al., Defendants.

ILLINOIS DEPARTMENT OF MINES &
MINERALS, Plaintiff,

v.

UNITED STATES DEPARTMENT OF
INTERIOR, et al., Defendants.

Civ. A. Nos. 81–645, 81–693, 81–2875
and 81–708.

United States District Court,
District of Columbia.

Dec. 3, 1982.

See also , 452 F.Supp. 327, 456 F.Supp.
1301, 627 F.2d 1346.

**1202**

Warner W. Gardner, John A. Macleod, Washington, D.C., for plaintiffs.

Alfred T. Ghiorzi and Larry Martin Corcoran, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

FLANNERY, District Judge.

This matter comes before the court on cross-motions for summary judgment by plaintiffs Peabody Coal Company, American Mining Congress, National Coal Company, and defendant James Watt, Secretary of the Interior, and defendant-intervenor National Wildlife Federation.[1]  Plaintiffs seek to have this court find that regulations for surface coal mining on prime farmlands promulgated on January 23, 1981, and amended on September 29, 1981 and July 30, 1982 by the Secretary of the Interior pursuant to the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.,* (Supp. IV 1980) are arbitrary, capricious or otherwise inconsistent with law. The court therefore must determine whether two separate regulations that limit statutory language exempting surface miners from certain permit and reclamation requirements of the prime farmlands provi-

sions of the Surface Mining Act are reasonable and consistent with the Act.

*The Structure of the Act*

The Surface Mining Control and Reclamation Act was passed in the 95th Congress and signed into law on August 3, 1977. The Act is a comprehensive statute designed to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). The Act's many requirements for the preservation and reclamation of land subject to surface mining reflect a recognition on the part of Congress that:

> [S]urface mining and reclamation technology are now developed so that effective and reasonable regulation of surface coal mining operations by the States and by the Federal Government in accordance with the requirements of this chapter is an appropriate and necessary means to minimize as far as practicable the adverse social, economic, and environmental effects of such mining operations.

30 U.S.C. § 1201(e).

Title II of the Act, 30 U.S.C. § 1211, creates an Office of Surface Mining Reclamation and Enforcement (OSM) within the Department of the Interior, and the Secretary of the Interior acting through OSM is charged with primary responsibility for administering and implementing the Act by promulgating regulations and enforcing its provisions. 30 U.S.C. § 1211(c).

The primary regulatory and enforcement provisions of the Act are found in Title V. That title establishes a two-tiered regulatory program. The two tiers consist of an interim, or initial, regulatory program and a permanent regulatory program. 30 U.S.C. § 1251(a). Section 501(a) of the Act 30 U.S.C. § 1251(a) requires the Secretary to promulgate interim regulations within

---

1. The National Wildlife Federation filed its motion as defendant-intervenor on behalf of the Illinois Farmers Union, Iowa Wildlife Federation, Illinois Wildlife Federation, Citizens for the Preservation of Knox County, Environmental Policy Institute, Illinois League of Women Voters, and the Illinois South Project, Inc.

The National Wildlife Federation, and the Illinois Department of Mines and Minerals also initiated actions against the Secretary of the Interior. However, these actions were voluntarily dismissed when the Secretary promulgated new regulations pursuant to the Surface Mining and Reclamation Act on July 30, 1982.

ninety days of the enactment of the statute. The second tier of regulation required by the Act, the permanent phase, is provided for in section 501(b), 30 U.S.C. § 1251(b). That section requires the Secretary to promulgate, within one year of the statute's enactment, a permanent regulatory program establishing procedures and requirements for preparation and approval of state programs and for development and implementation of federal programs. In addition, the permanent regulations must require adherence to all provisions of Title V of the Surface Mining Act, including all performance standards set forth in 30 U.S.C. § 1265.

Several of the provisions of the Act are known collectively as "prime farmlands provisions."[2] These sections establish special requirements for surface mining operations that are to be conducted on land that qualifies as prime farmland. For instance, a permit for surface coal mining on such lands may be granted only if the surface miner can demonstrate its "technological capability to restore such mined area, within a reasonable time, to equivalent or higher levels of yield as nonmined prime farmland in the surrounding area under equivalent levels of management." 30 U.S.C. § 1260(d)(1). The operator must also show that it can meet "the soil reconstruction standards" for prime farmland as provided in 30 U.S.C. § 1265(b)(7). That section requires that the separate soil layers on prime farmlands be segregated, stockpiled and protected from erosion or contamination, and then properly replaced and regraded. Furthermore, 30 U.S.C. § 1269(c)(2) seeks to ensure compliance with these rigorous requirements by providing that upon completion of its mining activities on prime farmland, a mine operator can have its performance bond released only on a showing

that soil productivity has returned to equivalent levels of yield as nonmined land of the same soil type in the surrounding area under equivalent management practices. 30 U.S.C. § 1269(c)(2).

The intent of the prime farmlands provisions of the Act is to ensure that applicants for surface mining permits have the technical capacity to return the soil to the same productive capacity as the soil had prior to being mined. However, the Act "grandfathers" certain surface coal mining operations, and provides an exemption from the permit requirements of 30 U.S.C. § 1260 and certain reclamation standards found in 30 U.S.C. § 1265(b)(7). Prime farmland found to fall within the grandfather provision of the Act is subject merely to topsoil removal and replacement requirements which are not as rigorous as the prime farmlands handling requirements.[3] The grandfather clause, found in § 510(d)(2), 30 U.S.C. § 1260(d)(2), exempts from the prime farmlands requirements three types of operations. It provides:

> Nothing in this subsection shall apply [1] to any permit issued prior to August 3, 1977, or [2] to any revisions or renewals thereof, or [3] to any existing surface mining operations for which a permit was issued prior to August 3, 1977.

(Numeration added).

The Secretary of the Interior, through the Office of Surface Mining Reclamation and Enforcement, has made several efforts to incorporate this exemption into the interim and permanent regulatory programs implementing the Act. On December 13, 1977, the Secretary promulgated interim regulations for the grandfather exemption. 42 Fed.Reg. 62659–61 (1977). Section 716.-7(a)(2) of the regulations specified the permit revisions and renewals for surface mining operations covered by the grandfather

---

**2.** Section 701 of the Act provides that "the term prime farmland shall have the same meaning as that previously prescribed by the Secretary of Agriculture." 30 U.S.C. § 1291(20). The Secretary's definition of prime farmlands is codified at 7 C.F.R. Part 657, and is incorporated into the Secretary of the Interior's regulations at 30 C.F.R. § 701.5.

**3.** Grandfathered land remains subject to the general reclamation standards set forth in 30 U.S.C. § 1265 which are directed at topsoil replacement, and require only postmining capability of prior use, and a "usable condition for sustaining vegetation." 30 U.S.C. § 1265(b)(5); 30 U.S.C. § 1265(b)(2). *See also, In re Surface Mining Regulation,* 452 F.Supp. 327, 340 (D.D.C.1978).

exemption. This section of the regulations provided as follows:

Permit renewals or revisions shall include only those areas that—

(1) Were in the original permit area or in a mining plan approved prior to August 3, 1977; or

(2) Are contiguous and under State regulation or practice would have normally been considered as a renewal or revision of a previously approved plan.

30 C.F.R. § 716.7(a)(2) (1978).

After the promulgation of these and other regulations, twenty-two plaintiffs, including the instant plaintiffs Peabody Coal Company and the National Coal Association, brought suit in the United States District Court for the District of Columbia challenging the regulations as arbitrary and capricious and otherwise inconsistent with law. These cases were consolidated for hearing and decision before this court.

On May 13, 1978, this court reviewed the original interim regulations and, as to the grandfather provision, found the regulation a reasonable exercise of the Secretary's discretion in implementing the statute. *In re Surface Mining Regulation Litigation,* 452 F.Supp. 327, 340 (D.D.C.1978). Plaintiffs appealed. Considering the question of the extent of the grandfather exemption for surface mining on prime farmlands and the District Court's interpretation of these interim regulations, the court of appeals held invalid § 716.7(a)(2) insofar as it improperly reduced the prime farmlands grandfather rights established by § 1260(d)(2) of the Act. *In Re Surface Mining Regulation Litigation,* 627 F.2d 1346, 1360–63 (D.C.Cir. 1980). The court of appeals found that the Act grandfathers pre-enactment permits, revisions or renewals of such permits, and "existing surface mining operations" for which a pre-enactment permit was issued. 627 F.2d at 1362. However, the court found section 716.7(a)(2) of the interim regulations extended the grandfather exemption only to areas included in pre-enactment permits or mining plans and areas that "would have normally been considered as a renewal or revision of a previously approved plan." *Id.* In addition, the court

noted, in those states that do not permit renewals or revisions, the regulation provided grandfather protection only to areas covered by pre-existing permits. *Id.* The court reached this conclusion premising that it was impossible to determine what would normally have been considered a renewal or revision in states that do not formally renew or revise mining permits. Examining the Act's legislative history, however, the court of appeals concluded that the third category under the Act's grandfather clause, exempting "existing surface mining operations", was added to the Senate Amendment for the very purpose of insuring the exemption of surface coal mines in states like Indiana that issue permits for one or more years but do not issue renewed or revised permits. *Id.* The court found that the third category of lands entitled to grandfather exemptions under the Act must be defined as existing surface mining operations based on a pre-enactment permit but which were neither explicitly covered by permit nor any renewal or revision thereof. Accordingly, the court found that the Secretary had impermissibly curtailed the Surface Mining Act's grandfather clause in § 716.7(a)(2) of the interim regulations because he rendered the third phrase of the exemption "inoperative" and "superfluous". *Id.*

The court of appeals also addressed the arguments of the Secretary, and the conclusion of the District Court, that the narrowed interpretation of the grandfather clause found in 30 C.F.R. § 716.(a)(2) was needed to prevent operators from claiming that mining "on all adjacent and nearby areas constituted continuances of the existing mine to such an extent that an entire portion of a state might be grandfathered even though it was not originally contemplated that the area[s] would be part of the same mine." 627 F.2d 1362 quoting Brief for Appellee (Secretary of Interior) at 77 & n. 79 and 452 F.Supp. at 340. The court of appeals noted that the Surface Miners had described this fear as an absurdity, because they are only claiming grandfather exemption for the continued and contiguous operation of the same ongoing mine along its seam. 627 F.2d 1362. The court of appeals

was persuaded by the Surface Miners response stating, "We believe that the anxiety of the Secretary and the District Court is unfounded and that the Surface Miners' interpretation of the grandfather clause is reasonable and in keeping with the intent of Congress." 627 F.2d at 1362.

The opinion of the court of appeals was entered on May 2, 1980. Following the decision, the Secretary and the National Wildlife Federation filed a petition for rehearing and a suggestion for rehearing *en banc.* The motions of the Secretary and the National Wildlife Federation contended that the court of appeals' adoption of the Surface Miners' interpretation of the scope of the grandfather clause could be interpreted to create an unrestricted exemption for all time for companies working large coal seams in Illinois. In response to the motions, the court of appeals in a *sua sponte* unpublished order, filed June 30, 1980, deleted the sentence which concluded that the "Surface Miner's interpretation of the grandfather clause is reasonable," and substituted the following paragraph:

> The issue essentially is whether under the Section 502(d) exclusion from the Act's more rigorous reclamation requirements of "any surface mining operations for which a permit was issued prior to August 3, 1977," there can be *any* ongoing operations on land that, although contiguous, was not covered by the permit. We believe that, if the quoted statutory provision is to have any meaning at all, there can be; and that the legislative history of the last-minute addition to the Act of the words quoted above, disclosed a Congressional purpose that there can be. The Secretary's interim regulation to the contrary was thus in conflict with the statute. [emphasis in original] [footnotes omitted].

*In Re Surface Mining Regulation Litigation,* No. 78–2190 (D.C.Cir. June 30, 1980).

On April 16, 1980, several weeks prior to the court of appeals' decision, the Secretary proposed new permanent and interim regulations.[4] On June 10, 1980, the period for comment on the April proposals was extended in light of the May decision of the court of appeals. On August 25, 1980, the period for comment was further extended, ultimately to September 4, 1980. 45 Fed. Reg. 39448, 56364 (1980). Finally, on January 19, 1981, the Secretary promulgated a final rule defining the extent of the prime farmlands exemption, and it was published on January 23, 1981. 416 Fed.Reg. 7894 (1981). The new regulations included two provisions which lie at the heart of the instant action: (1) a provision that in order to qualify for the prime farmlands exemption the permittee must have had a legal right to mine the lands prior to August 3, 1977, and (2) a provision that all grandfather exemptions terminate on August 3, 1982.[5] Before the regulations would have become effective, the Secretary postponed the effective date of the regulations, in a series of published orders, until September 29, 1981. 46 Fed.Reg. 10707 (1981); 46 Fed. Reg. 18023 (1981); 46 Fed.Reg. 20211 (1981); 46 Fed.Reg. 23924 (1981); 46 Fed. Reg. 31258 (1981); 46 Fed.Reg. 41046 (1981).

In March, 1981, within the sixty days provided by the Act for judicial review of challenged regulations, plaintiffs filed suit in this court seeking summary judgment enjoining defendants from implementing the final rules, and declaring the rules to be arbitrary, capricious and contrary to law.

---

**4.** The court of appeals referred to these new regulations in its amended order of June 30, 1980 by adding a new footnote to its prior decision. The court of appeals stated: "Some two weeks prior to the issuance of the opinion, the Secretary initiated notice and comment upon a new proposed regulation to replace the suspended permanent regulation on this subject ... and to amend the interim regulation we are now addressing. This was first brought to the attention of the court in response directed by the court to be filed to the NWF's petition for rehearing. The new proposed regulation is not, of course, before us for review." *In Re Surface Mining Regulation Litigation,* No. 78–2190 (D.C.Cir. June 30, 1980).

**5.** With the exception of a change in the definition of "single continuous mining pit" to ensure inclusion of non-contiguous parcels, the portion of the regulations implementing the third clause of the grandfather exemption were identical to those proposed April 16, 1980.

On September 29, 1981, the regulations made final on January 19, 1981 were adopted and made immediately effective except

6. The September 29, 1981 amendments to the interim and permanent regulations affecting the prime farmlands provisions provide:

**PART 716—SPECIAL PERFORMANCE STANDARDS**

A. 30 CFR 716.7(a)(2) and (a)(3) are added to read:

**§ 716.7  Prime farmland.**

(a) * * *

(2) Except as otherwise provided in this paragraph, the requirements of the section are applicable to any lands covered by a *permit application filed on or after August 3, 1977.* This section does not apply to:

(i) Lands on which surface coal mining and reclamation operations are conducted pursuant to any permit issued prior to August 3, 1977; or

(ii) Lands on which surface coal mining and reclamation operations are conducted pursuant to any renewal or revision of a permit issued prior to August 3, 1977; or

(iii) Lands included in any existing surface coal mining operations for which a permit was issued for all or any part thereof prior to August 3, 1977, provided that:

(A) Such lands are part of a single continuous surface coal mining operation begun under a permit issued before August 3, 1977; and

(B) The permittee *had a legal right to mine* the lands prior to August 3, 1977, through ownership, contract, or lease but not including an option to buy, lease, or contract; and

(C) The lands contain part of a continuous recoverable coal seam that was being mined in a single continuous mining pit (or multiple pits if the lands are proven to be part of a single continuous surface coal mining operation) begun under a permit issued prior to August 3, 1977.

(3) For purposes of this section:

(i) "renewal" of a permit shall mean a decision by the regulatory authority to extend the time by which the permittee may complete mining within the boundaries of the original permit, and "revision" of the permit shall mean a decision by the regulatory authority to allow changes in the method of mining operations within the original permit area, or the decision of the regulatory authority to allow incidental boundary changes to the original permit;

(ii) a pit shall be deemed to be a single continuous mining pit even if portions of the pit are crossed by a road, pipeline, railroad, or powerline or similar crossing;

that the provision for a uniform cut-off date for the grandfather clause was deleted pending further rulemaking.[6]  46 Fed.Reg.

(iii) a single continuous surface coal mining operation is presumed to consist only of a single continuous mining pit under a permit issued prior to August 3, 1977, but may include non-contiguous parcels if the operator can prove by clear and convincing evidence that, prior to August 3, 1977, the contiguous parcels were part of a single permitted operation. For the purposes of this paragraph, clear and convincing evidence includes, but is not limited to, contracts, leases, deeds or other properly executed legal documents (not including options) *that specifically treat physically separate parcels as one surface coal mining operation.*

\*    \*    \*    \*    \*    \*

**PART 785—REQUIREMENTS FOR PERMITS FOR SPECIAL CATEGORIES OF MINING**

B. 30 CFR 785.17(a) is revised to read:

**§ 785.17  Prime farmland.**

(a) This section applies to any person who *conducts or intends to conduct surface coal mining and reclamation operations on prime farmlands historically used for cropland.* This section does not apply to:

(1) Lands on which surface coal mining and reclamation operations are conducted pursuant to any permit issued prior to August 3, 1977; or

(2) Lands on which surface coal mining and reclamation operations are conducted pursuant to any renewal or revision of a permit issued prior to August 3, 1977; or

(3) Lands included in any existing surface coal mining operations for which a permit was issued for all or any part thereof prior to August 3, 1977, provided that:

(i) Such lands are part of a single continuous surface coal mining operation begun under a permit issued before August 3, 1977; and

(ii) The permittee had a legal right to mine the lands prior to August 3, 1977, through ownership, contract, or lease but not including an option to buy, lease, or contract; and

(iii) The lands contain part of a continuous recoverable coal seam *that was being mined* in a single continuous mining pit (or multiple pits if the lands are proven to be part of a single continuous surface coal mining operation) begun under a permit issued prior to August 3, 1977.

(4) For purposes of this section:

(i) "Renewal" of a permit shall mean a decision by the regulatory authority to ex-

47720 (1981). The Office of Surface Mining observed that the termination provision had produced considerable controversy and that further rulemaking was required in "order to provide maximum public participation and to enable OSM and commenters to gather additional information on potential solutions to this issue." 46 Fed.Reg. 47720 (1981).

On July 30, 1982, the Secretary promulgated interim final regulations reinstating the cutoff date. 47 Fed.Reg. 32939 (1982). The regulations added 30 C.F.R. 716.-7(a)(2)(iv) and 785.17(a)(5) imposing an April 3, 1983 cutoff for the prime farmlands grandfather exemption. On August 13, 1982, Industry plaintiffs filed a new motion for summary judgment challenging the reinstatement of the cutoff date as arbitrary, capricious, and otherwise inconsistent with law.

I. *The "Legal Right to Mine" Limitation*

Congress expressly chose not to apply the special environmental protection measures generally applicable to strip mining on prime farmlands to all coal mining operations on such land. Rather Congress sought to exempt certain mine operations from the Act's strict reclamation and soil handling measures. Specifically, Congress sought to exempt, in addition to other categories of operations, "existing surface mining operations for which a permit was issued prior to the date of enactment of this Act." Section 510(d)(2) of the Surface Mining Control and Reclamation Act. This clause, exempting "existing surface mining operations" for which a permit was issued prior to August 3, 1977, has generated the litigation history

chronicled earlier, and the present action. The fundamental issue with respect to that clause is whether mines existing at the time of the Act can be allowed to expand beyond the boundaries of any pre-Act permit (without meeting the special prime farmlands standards) and, if so, how extensive an expansion is permitted by statute. The court of appeals held that the clause at issue *did* exempt *some* land not covered by the initial permit, yet shed no light on the present inquiry: the extent of lands not covered by a pre-enactment permit or any extension or revision thereof, which are nevertheless exempt as "existing surface mining operations."

The Secretary's interpretation of the grandfather's exemption found it properly limited to cases where:

> The permittee had a *legal right to mine* the lands prior to August 3, 1977, through ownership, contract, or lease but not including an option to buy, lease, or contract;

30 C.F.R. § 785.17(a)(3)(ii); 30 C.F.R. § 716.7(a)(2)(iii)(B) (emphasis added). Plaintiffs argue that the Secretary's interpretation is contrary to the intent of Congress and the express language of the statute. They argue that the Secretary's imposition of a "legal right to mine" limit is invalid, and raise two general objections to the agency's actions. First, the industry argues that the regulation is contrary to the express language of and legislative history surrounding the grandfather exemption. Second, the industry asserts that, although some area limits on the exemption are permissible, the geographical limits of each

---

tend the time by which the permittee may complete mining within the boundaries of the original permit, and "revision" of the permit shall mean a decision by the regulatory authority to allow changes in the method of mining operations within the original permit area, or the decision of the regulatory authority to allow incidental boundary changes to the original permit;

(ii) A pit shall be deemed to be a single continuous mining pit even if portions of the pit are crossed by a road, pipeline, railroad, or powerline or similar crossing;

(iii) A single continuous surface coal mining operation is presumed to consist only of a single continuous mining pit under a permit issued prior to August 3, 1977, but may include non-contiguous parcels if the operator can prove by clear and convincing evidence that, prior to August 3, 1977, the non-contiguous parcels were part of a single permitted operation. For the purposes of this paragraph, clear and convincing evidence includes, but is not limited to, contracts, leases, deeds or other properly executed legal documents (not including options) that specifically treat physically separate parcels as one surface coal mining operation.
(Secs. 201, 501, 527 and 529, Pub.L. 95–87 Stat. 445 (30 U.S.C. 1201))

mine must be established by examining the prior investments, purchasing policies, mining mechanics, and other indications of operator intent to mine such area.

### A. The Legislative History of the Grandfather Clause

■ The legislative history of the grandfather exemption for surface mining on prime farmlands has been analyzed by the court of appeals, and is carefully set forth in that opinion. 627 F.2d at 1360–1363. Plaintiffs maintain that a review of the legislative history of the Act leads ineluctably to a conclusion that the language of the Act cannot be reasonably interpreted as permitting a legal right to mine limitation on the grandfather exemption.

The prime farmlands provisions of the Surface Mining Act came at a late stage in the history of the Act. The provisions appeared as floor amendments after both the House and Senate Committees had reported the bill that was finally enacted. The House rejected and the Senate adopted the amendment. 123 Cong.Rec. 15711–21 (1977); 12677–81 (1977). The grandfather exemption in the Senate amendment was identical to that enacted; the rejected House amendment limited that exemption to mining operations which were covered by existing permits, or their revisions or renewals. 123 Cong.Rec. 12677 (1977). The Conference Committee, in accepting the language of the Senate amendment, expressed a desire to "assure the continued operation of ongoing mines." H.R.Rep. No. 493, 95th Cong., 1st Sess. 105 (1977). During the Senate debate on the Committee Report, Senator Metcalf agreed with the statement of Senator McClure that "the exclusion will apply to continued operation of an on-going mine beyond the acreage and time covered in the existing permit at the time of the enactment of the act, just as long as the continuance does, in fact, constitute a continued operation of an ongoing mine." 123 Cong.Rec. S12,442 (daily ed. July 20, 1977). The court of appeals rejected more restrictive interpretations of the grandfather clause offered by Congressman Tsongas. Tsongas's interpretation would

have limited grandfather rights to lands specified in the permits alone. 627 F.2d 1361–62.

The court of appeals, following its extensive review of the legislative history, concluded simply that some lands not covered by state permit, or its revision or renewal, were grandfathered. However, the court also extracted and discussed legislative history that documents the reason for the "existing surface mining operations" addition to the grandfather exemption that, in turn, provides some indication of the intended scope of grandfathered lands. The court noted that the existing surface mining operations clause was added to the exemption in order to "insur[e] the exemption and continuous operation of surface mines on prime farmlands in states, like Indiana, that issue permits for one or more years but do not issue renewed or revised permits." 627 F.2d at 1362, citing 123 Cong.Rec. S8802 (daily ed. May 26, 1977). Senator Bayh, in clarifying the change adding the clause stated:

As originally introduced, this exemption from a special review process would have treated Indiana inequitably, because under Indiana state law technically there are only new annual permits and no renewals, even though operators meeting the conditions of their permit routinely get a new or renewed permit upon application.

I was very gratified that the author of the prime farmland enactment, my distinguished colleague Senator Culver of Iowa, modified his prime farmland amendment at my suggestion, to give ongoing Indiana stripping operations the same protections afforded operations in other states despite the unusual procedures mandated by our State's laws.

123 Cong.Rec. S8802 (daily ed. May 26, 1977).

The court of appeal's conclusion, and Senator Bayh's explanation of the purpose underlying the exemption, is that the clause was added in the interests of fairness, and to insure relative uniformity in the application of the exemption across states. The

court of appeals concluded that Congress, in enacting § 510(d)(2) recognized that "existing operators on prime farmlands had already made large investments in reliance on the requirements in effect at that time and that such existing mines should continue in operation *independent of the fortuitous nature of the states' permit machinery."* 627 F.2d at 1363 n. 18 (emphasis added).

A second purpose, in addition to that of uniformity among states, is to ensure that the exemption will apply only to acreage and time beyond that specified in the permits or revisions, that does *"in fact,* constitute a continuing operation of an ongoing mine." 627 F.2d at 1361 (emphasis added) quoting 123 Cong.Rec. 12,442 (daily ed. July 20, 1977).

Taken together, the court of appeals decision elucidates two principles as rather clearly expressing Congressional intent. The scope of the grandfather exemption is to be limited to areas that can be characterized as a presently operating mine, and the exemption must be expanded beyond permit boundaries to level the effects of the Act across states. So understood, it is clear that the present regulations are not inconsistent with the legislative purpose. In contrast to the regulations invalidated by the court of appeals, the current regulations do not render the third clause of the grandfather exemption "inoperative or superfluous." Indeed, the current regulations track the statute in specifically exempting "existing mining operations." 30 C.F.R. § 785.-17(a)(3). The regulations found invalid by the court of appeals ignored the statutory exemption for such operations. In addition, the present challenged regulations respond to Congressional concerns for equal application of the grandfather exemption and to the court of appeal's holding that *some* lands not covered by permit be grandfathered. Operations in any state, regardless of the permit machinery in that state, will be grandfathered if the operator can dem-

onstrate that he had, prior to 1977, a legal right to mine the land. Finally, the regulations attempt to insure that existing mines are grandfathered. The Secretary sought merely to ensure that the grandfather exemption was confined to lands that, in fact, constituted a mine by establishing an objective, identifiable and verifiable standard. The Secretary did not adopt a standard that depended upon a mine operator's showing that the operator had a reliance interest in the lands at issue. The issue essentially devolves into a controversy between the operators and the Secretary about the test to be applied to determine whether a mine actually exists. Industry plaintiffs do not challenge the Secretary's authority to limit the grandfather exemption, but merely challenge the propriety of the limit chosen. For the reasons already expressed, this court finds the Secretary's limits to be in conformance with the Act, its legislative history, and the court of appeals decision. For the reasons set forth below, this court finds the Secretary's construction of the phrase "existing mining operation" to be a justifiable and reasonable interpretation of the statutory exemption.[7]

### B. *The Industry's Proposal*

Plaintiffs highlight the frequent legislative reference to "existing mines" or "ongoing mines," and contrast the clearly expressed Congressional intent to grandfather such mines with the equally clear Congressional intent not to exempt "new strip mining" or "new strip mine starts." Plaintiffs' Memo at 10. Plaintiffs state that "existing" and "ongoing" are simple words, not terms of art, and are necessarily interpreted to preclude a "legal right to mine" exclusion on the grandfather exemption. The Secretary counters plaintiffs' interpretation by maintaining that existing operations necessarily differ from "future operations" and that the statutory exemption necessarily confines the exemption to lands

---

7. The Industry's proposal (*see* note 9, *infra*) which would have the extent of the 1977 surface mining operations determined on the basis of all relevant factors does little to reduce the ambiguity in the word "existing", and adds elements of ambiguity. Such a proposal also does little to advance the concerns for uniformity expressed by Congress and repeated by the court of appeals.

under contract or rights of ownership. Secretary's Mem. 19–20 n. 2. However, both plaintiffs and defendant quickly abandon their discussions of the plain meaning of the statute, realizing that "existing" or "ongoing" or "future" have little meaning without a more definitive referent. The provision containing the grandfather exemption does not define the extent of an operation to be considered a "surface mining operation", nor does the legislative history shed any light on the phrase.[8]

Plaintiffs argue that industry practice with respect to surface mining investment and land procurement constitutes the appropriate standard by which to construe "existing surface mine operations." Plaintiffs describe the practice of large surface mining operations as a forward-looking process of investment and land purchase in which the parameters of the operations are set by the extent of the coal system, and investments made in reliance upon preclusive control over the seam. Plaintiffs describe a typical large surface mine as based on a major investment in equipment and land, designed to follow a seam or seams over several decades. The operator does not attempt to obtain a legal right to mine. Rather, the operator ensures legal control only over that land needed in the next year or two of mining. Plaintiffs' Mem. at 6. For the rest of the land on which the seam lies, the operator will merely acquire a sufficient number of separate parcels to prevent or discourage a competitor from seeking to acquire the land or mining rights proximate to the seam for his own operations. With that sort of preclusive control, plaintiffs argue, the operator is warranted in making his large investment in equipment. Plaintiffs conclude, "It is this *effective* control, therefore, and not his *legal* right to mine, which justifies the operator's enormous investment in a mine, and which therefore should be recognized as the proper determinant of his 'existing mine.'" Plaintiffs' Reply at 5 (emphasis in original). Plaintiffs urge endorsement of a proposal submitted to the Secretary during the notice and comment process, outlining a set of factors to be used by OSM in measuring the extent of the operator's investment and effective control over lands.[9]

8. Section 1291(28) of the Act does, however, define "surface coal mining operations." The operations are objectively defined:

(A) activities conducted on the surface of lands in connection with a surface coal mine or subject to the requirements of section 1266 of this title surface operations and surface impacts incident to an underground coal mine, the products of which enter commerce or the operations of which directly or indirectly affect interstate commerce. Such activities include excavation for the purpose of obtaining coal including such common methods as contour, strip, auger, mountaintop removal, box cut, open pit, and area mining, the uses of explosives and blasting, and in situ distillation or retorting, leaching or other chemical or physical processing, and the cleaning, concentrating, or other processing or preparation, loading of coal for interstate commerce at or near the mine site: *Provided, however,* That such activities do not include the extraction of coal incidental to the extraction of other minerals where coal does not exceed 16⅔ per centum of the tonnage of minerals removed for purposes of commercial use or sale or coal explorations subject to section 1262 of this title; and

(B) the areas upon which such activities occur or where such activities disturb the natural land surface. Such areas shall also include any adjacent land the use of which is incidental to any such activities, all lands affected by the construction of new roads or the improvement or use of existing roads to gain access to the site of such activities and for haulage, and excavations, workings, impoundments, dams, ventilation shafts, entryways, refuse banks, dumps, stockpiles, overburden piles, spoil banks, culm banks, tailings, holes or depressions, repair areas, storage areas, processing areas, shipping areas and other areas upon which are sited structure facilities, or other property or materials on the surface, resulting from or incident to such activities; and [sic, nothing follows "and" in the definition].
(emphasis in original). Section 701(28), 30 U.S.C. § 1291(28).

9. The proposal would have the extent of the 1977 "existing surface mining operation" determined on the basis of such relevant factors as: (a) maps showing areas already mined and to be mined; (b) maps showing areas and dates when the right to mine has been acquired or sought; (c) contracts for the sale of coal; (d) maps showing the intended mining plan and coal exploration activities; (e) evidence of legal and financial commitments; (f) mine production records and evidence of the machinery capability; (g) size and continuity of the labor force. Plaintiffs' Mem. at 21. On June 10,

Defendant explained his choice of a single, definitive, "legal right to mine" criterion in the preamble to the regulation. 46 Fed.Reg. 7898–99 (1981). The Office of Surface Mining explained:

> The Secretary has concluded that a 'right to mine' as indicated by ownership, contract, or lease is both indicative of the geographical scope of the mining operation at the time the permit was issued and effective in fairly limiting the scope of the exemption.

46 Fed.Reg. 7899 (1981). OSM also explained its decision to exclude options to purchase, contract or lease, from lands the permittee had a "legal right to mine."

> Some commentators have criticized the exclusion of options to purchase, contract or lease. They assert that the acquisition of such an option is indicative of an intent to include the property within the ongoing mine operation. The Secretary does not accept this assumption. By the very nature of an option, an operator is in no way bound or committed to including the property within the operation. At most, an option can be said to indicate that the operator is considering including the land in the operation. Thus, the Secretary believes that an option does not demonstrate that the land is within an ongoing mine operation. *Id.*

The Secretary also discussed the case-by-case alternative proffered by the Industry. The Secretary found this alternative to be contrary to the strong public policy embodied in the Act that mining operations be treated uniformly across states:

> Some commenters favored a case-specific determination on the applicability of the exemption to individual mining operations based on suggested criteria (*i.e.,* mining plans, maps, and documents relating to the mining operation which were prepared before August 3, 1977; information concerning the company's legal and financial commitments relating to the operation; government documents and approvals relating to the operation). The flaw in this approach is that it would undermine the uniform treatment of mining operations in different states as required by the Act. The criteria suggested by the commenters of necessity depend upon information developed in conjunction with pre-Act state permit requirements. The application of these suggested criteria would thus result in exemptions based on the vagaries of pre-Act state permit procedures. See testimony of John Conlon (National Coal Association/American Mining congress), May 15, 1980, pp. 53–54. Congress clearly intended ". . . that such existing mines should continue in operation independent of the tortuitous [sic] nature of states' permit machinery." *In re: Surface Mining Regulation Litigation, supra* [627 F.2d 1346 at 1363, ftnt. 18]. (May 2, 1980) at 31, ftnt. 18. Moreover, Congress explicitly stated in the Act that national standards were necessary to insure that competition among coal producers in different states would not undermine the ability of the individual states to control coal operations within the states. Section 101(g). Congress recognized the importance of uniformity in the regulatory standards. Thus the commenters' approach is at odds with congressional intent. In any event, operators have some opportunity to demonstrate the particular circumstances of each case for purposes of proving the existence of "a single continuous surface coal mining operation" under these regulations.

45 Fed.Reg. 7898 (1981).

The court finds that the Secretary has carefully considered the Industry's alternative, in light of its practices, and has rejected it in favor of a single criterion that is reasonable, and supported by the policies underlying the Act. The preclusive control tests advocated by the Industry may constitute a second reasonable means of effectuating the statute. However, the court will

1980, during the extended notice and comment period for consideration of the instant regulations, the Industry's proposal was listed as an alternative then being considered by OSM. (45 Fed.Reg. 39448 (1980)).

not engage in a comparative review of the Secretary's standard and the proposal of the Industry. In limiting the phrase "existing surface mining operation" to lands for which the operator had a legal right to mine, the Secretary sought to construe the ambiguous and otherwise undefined term "existing" in light of the specific need for uniformity in the grandfather exemption itself, and the additional public policies incorporated in the Act.[10] The role of a reviewing court is to ensure that the Secretary has acted reasonably in interpreting and implementing the statute. *See Kennecott Corporation v. Environmental Protection Agency*, 684 F.2d 1007, at 1012 (D.C. Cir.1982); *Lead Industries Assoc. v. Environmental Protection Agency*, 647 F.2d 1130, 1160 (D.C.Cir.1980). The court finds that, although the limitation devised by the Secretary is not the sole permissible limit on the grandfather exemption,[11] it is nevertheless reasonable and consistent with the language and purposes of the Act.[12] *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Citizens to Save Spencer County v. Environmental Protection Agency*, 600 F.2d 844, 891 (D.C.Cir. 1979).

The plaintiffs also argue that the agency support for the regulation is defective in several respects. Plaintiffs state that the agency justification for the legal right to mine provision is factually unsupported. Plaintiffs' Mem. at 15–16. They point out that the Secretary's statement that the legal ownership test accurately indicates the geographic scope of the operation is inconsistent with industry testimony that industry practices alone establish the intended scope of plaintiffs' mining. However, it is clear that the industry proposal was made clear to the Secretary. It was equally clear that the Secretary chose to reject that interpretation after full opportunity for notice and comment. In rejecting the proposal, the Secretary was not necessarily rejecting the industry's portrait of its business practices. Rather, the Secretary's adoption of the right to mine limit rejects the premise that industry practices, however documented, constitute the only basis for defining the term "existing mine."

The plaintiffs argue analogously that the Secretary's action is unlawful because OSM did not consider "all comments and relevant data presented at [a] hearing before final promulgation." Plaintiffs' Mem. at 18; citing 30 U.S.C. § 1251(a)(C). This court finds that the Secretary thoroughly considered opposing positions on this matter, and carefully reviewed the positions of the surface miners. The frequent postponements of the effective date of the regulations, and extensions of the time for notice and com-

---

10. The Secretary points out that the "legal right to mine" standard attempts to harmonize three general policies incorporated in the Act. Secretary's Motion for Summary Judgment at 14–16. The Act is intended to "assure that the coal supply essential to the Nation's energy requirements . . . is provided to minimize damage to the environment and to productivity of the soil and to protect the health and safety of the public;" 30 U.S.C. § 1201(d); and "to insure that competition in interstate commerce among sellers of coal produced in different States will not be used to undermine the ability of the several States to improve and maintain adequate standards on coal mining operations within their borders." 30 U.S.C. § 1201(g).

11. Another limitation on the exemption limits grandfathered lands to lands that contain "part of a continuous recoverable coal seam that was being mined in a single continuous mining pit" C.F.R. § 785.17(a)(3)(iii). Industry plaintiffs do not challenge this limitation.

12. As stated by the Supreme Court:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result that we would have reached had the question arisen in the first instance in judicial proceedings." [Citations omitted] "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, or making the parts work efficiently and smoothly while they are yet untried and new.' "
*Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964).

ment on the various alternative proposals published in the Federal Register, are testament to the care shown by the Secretary in reviewing this regulation.

II. *The "Cut-Off Date" Limitation* [13]

■ On July 30, 1982, the Secretary promulgated a second controversial limitation to the grandfather exemption of the prime farmlands provisions of the Act. This limitation shall be referred to as the "cut-off date". The "cut-off date" limitation provides that *all* grandfather exemptions terminate on April 3, 1983. This limitation applies not only to the third clause of section 510(d)(2) terminating the exemption for existing surface mining operations for which a permit was issued prior to August 3, 1977 but to the first two clauses as well. Accordingly, the regulation would terminate grandfather rights for any lands subject to a permit prior to August 3, 1977, or to any lands that would be subject to a revision or renewal of that permit, as well as to "existing surface mining operations" for which a permit had been issued.

The regulation has followed a torturous and erratic course toward its eventual promulgation on July 30, 1982. On April 16, 1980, the Secretary first proposed a termination date for the grandfather provision. 45 Fed.Reg. 25996 (1980). Although endorsing the date at that time, the Secretary stated that OSM "expressly requests comments on alternatives to this rule." 45 Fed. Reg. 25995 (1980). On June 10, 1980 the comment period was extended to June 25 in light of the May 2 decision of the *court of appeals* in *In re Surface Mining Regulation Litigation,* 627 F.2d 1346. The Secretary commented at that time, "The public is also specifically advised that the Department has received a broad range of comments on the proposed regulations and may adopt final regulations that differ from the proposal." 45 Fed.Reg. 39448 (1980). On Au-

gust 25, 1980, the invitation to comment was reopened and extended to September 4, 1980. 45 Fed.Reg. 56364 (1980).

On January 23, 1981, the Secretary adopted the April 16, 1980 proposal of a termination date for the grandfather exemption. The specific regulatory provision was then found at § 785.17(a)(6) of the permanent program [14] and provided as follows:

> The exceptions granted by paragraphs (a)(1)–(5) of this section apply only to lands mined to the *coal face and related benches prior to August 3, 1982.* (emphasis added) 46 Fed.Reg. 7895 (1981).

The Secretary explained in publishing the final rules:

> In accordance with the [Court of Appeals' decision as amended] . . ., the final regulations allow some grandfathering outside of the original pre-August 3, 1977, permit area and establish a cut-off date of August 3, 1982. The regulations respond to the Congressional concern that the grandfather clause give some flexibility to existing operations . . .

> The regulations also respond to Congressional concern that mining operations in different states be accorded equal grandfathering treatment . . . The Secretary believes that a fixed cut-off date for grandfathering is necessary to respond fully to these Congressional concerns.

> The regulations are also based on the prevailing congressional concern, the protection of the nation's farmlands. To satisfy this concern and these statutory requirements, the Secretary believes that he has a duty to ensure that full environmental protection is made applicable to all prime farmlands within a reasonable time. A cut-off date ensures that mining operations cannot continue for a period

---

**13.** On September 10, 1982 this court granted plaintiffs' motion for summary judgment and held that the Secretary's regulations at 30 C.F.R. § 716.7(a)(2)(iv) and 785.17(a)(5) were arbitrary and capricious. The following discussion set forth in greater detail the reasons for the court's ruling.

**14.** Identical language, using different paragraph numeralization was also found in § 716.-7(a)(2)(vi) applicable to the interim program. 46 Fed.Reg. 7900 (1981).

far beyond the time needed to provide a fair and reasonable transition period.[15]

The January 23, 1981 promulgation was postponed by a series of orders beginning with a February 4, 1981 notice in the Federal Register. 46 Fed.Reg. 10707 (1981). On April 13, 1981, the Secretary suspended the effective date of the rules until May 5, and requested public comment concerning whether the rules should be suspended indefinitely pending further rulemaking. 46 Fed.Reg. 20211 (1981). On June 15, 1981, the effective date of the rule was again postponed until August 5, 1981. In postponing the rule, the Secretary reported that "[v]oluminous comments have been received from the public during the comment period which ended May 9, 1981. A deferral of effective dates for an additional sixty days will enable OSM to analyze thoroughly the public comments and decide whether to modify, issue or suspend these rules indefinitely pending the outcome of further rulemaking." 46 Fed.Reg. 31258 (1981).

On September 29, 1981, the Secretary made effective the regulations implementing the right to mine limit on the grandfather clause, but suspended the cut-off date pending further rulemaking. In taking this action, the Secretary stated:

> The public comments received by OSM in past rulemakings and in this rulemaking demonstrate that considerable controversy surrounds the concept of a uniform termination date. In order to provide maximum public participation and to enable OSM and commentators to gather additional information on potential solutions to this issue, OSM announces here its intention to engage in further rulemaking on this issue. Meanwhile, the 1982 termination date which appeared in

the January 23, 1981 rules will not be made effective and will be deleted.

46 Fed.Reg. 47721 (1982).

On February 12, 1982, the Illinois Department of Mines and Minerals and the National Wildlife Federation moved for summary judgment in this court, asserting that the Secretary's amendment of prime farmlands regulations deleting the cut-off date was arbitrary, capricious, or otherwise inconsistent with law.

On March 22, 1982, OSM published and requested comments on a new proposal for placing a termination date upon the grandfather exemption. 47 Fed.Reg. 12310–13 (1982). The rulemaking notice proposed two principal alternatives:

> A. Terminate all grandfather rights on August 3, 1982;
>
> B. Allow each state with an approved permanent program to establish, within five years, a date when the grandfather rights would terminate.

The notice also stated "OSM may decide after considering the comments that no termination date for the grandfather exemption is practicable. Or, OSM may determine that the exemption should continue for certain types of surface mining operations and not others." 47 Fed.Reg. 12312 (1982).

On July 30, 1982, the Secretary promulgated a new regulation, identical to that suspended on September 29, 1981, except that the cut-off date was altered from August 3, 1982 to April 3, 1983. 47 Fed.Reg. 32939, 32042–43 (1982); 30 C.F.R. §§ 716.-7(a)(2)(iv), 785.17(a)(5).[16] The sections read:

> "The exceptions granted by [specified paragraphs] of this section apply only to

---

**15.** The Secretary continued with respect to the practical advantages of the cut-off date:

> [T]he cut-off date insures an orderly transition period between pre-Act and post-Act standards, prevents mining from continuing indefinitely through expansions to contiguous and non-contiguous areas, reduces the potentially wide variations in the application of the law in the different states, and provides certainty to the public and the industry

with regard to the scope of the prime farmland exemption. The five-year period chosen corresponds to that of a permit under the Surface Mining Act (Section 506(b)) and is reasonable in fulfilling the purposes stated above.

46 Fed.Reg. 7899 (1981).

**16.** The rules were issued as interim final rules with an effective date of August 30, 1982.

lands mined to the coal face and related benches prior to April 3, 1983." [17]

Industry plaintiffs challenged the adoption of the April 3, 1983 cut-off date by moving for summary judgment declaring the regulation arbitrary and capricious. In support of their motion, plaintiffs argue that the regulation is inconsistent with the plain statutory language of Section 510(d)(2) and with the legislative history of the grandfather clause. This court finds no support in the language or legislative history of the Act permitting a construction of the statute that authorizes a regulation terminating the grandfather exemption of section 510(d)(2). Therefore, the court holds invalid sections 716.7(a)(2)(iv) of the interim regulations and § 785.17(a)(5) of the permanent regulations insofar as they improperly reduce the prime farmland grandfather rights expressly established by section 510(d)(2) of the Act. For the reasons set forth below, the limitation is inconsistent with law.[18]

### A. The Grandfather Clause

Section 1260(d)(2) of the Surface Mining Control and Reclamation Act provides that three categories of mining operations are exempt from certain strict requirements of the prime farmlands provisions of that Act. The categories are lands subject to (1) permits issued prior to August 3, 1977; (2) any renewals or revisions of such permits; and (3) lands falling within "existing mining operations" for which a permit was issued prior to August 3, 1977.

The court has reviewed the legislative history of the grandfather exemption, which sheds light on the third clause of the exemption, "existing mining operations." Although some conflict was evident with respect to the interpretation of that statutory provision, it appears that the Secretary

had properly balanced and harmonized competing public policies and had reasonably construed the statute to include a "right to mine" limit on the geographic scope of lands exempted by the third clause. The termination date in 30 C.F.R. § 785.17(a)(5) extinguishes the grandfather exemption of 30 U.S.C. § 1260(d)(2) effective April 3, 1983. The statutory language does not hint at such a limitation. Grandfather rights attach upon grant of a permit pre-1977, and continue without temporal limitation. The plain meaning of the statute is unmistakeable. Indeed a temporal limitation is logically inconsistent with the notion of revisions or renewals. Such terms plainly and unequivocally suggest that prior permits subject to pre-Act requirements, as well as their continuation over time within the same geographic boundaries, remain grandfathered.

The legislative history of the grandfather exemption is entirely consistent with the plain language of the statute. Senators Percy, Culver, and others presented the grandfather exemption amendment in the Senate. 123 Cong.Rec. S8103 (daily ed. May 20, 1977). Senator Percy described the action as a proposal which provides for "case-by-case variances for new permits-and grandfathers all existing permits for stripping prime farmlands." 123 Cong.Rec. S7871 (daily ed. May 18, 1977). The Conference Committee accepted the language of the Senate amendment stating:

> The Senate amendment contained a special test, effective on the date of enactment, with respect to the protection of prime farmlands. Any mine application whose area in prime farmlands exceeded 10 percent of the total area included in the application would have to demonstrate that such lands would be restored to full productivity. The granting of

---

**17.** The April 3, 1983 date was chosen to permit surface miners time to establish reclamation plans, soil surveys, and proof of technological capacity to reclaim the soil, and comply with the other requirements of the permit approval process required prior to approval of a new permit to mine prime farmlands.

**18.** The standard of review applicable to this court's consideration of the regulation at issue is set forth in 30 U.S.C. § 1276(a)(1) which provides in pertinent part: "Any action subject to judicial review under this subsection shall be affirmed unless the court concludes that such action is arbitrary, capricious, or otherwise inconsistent with law."

such a permit would be discretionary on the part of the regulatory authority. Permits and coal surface mine operations existing on the date of enactment would not have to meet this test.

The House Bill had no such provision. Conferees agreed to a revised provision which stipulates that such a permit shall be granted if the regulatory authority finds that the applicant has "the technological capability to restore such mined area, within a reasonable time, to equivalent or higher levels of yield as nonmined prime farmland soil in the surrounding area under equivalent levels of management." The *exclusion for existing mines, permit or renewals thereof after the date of enactment was also agreed to by the Conferees who wished to assure continued operation of ongoing mines.*[19] (emphasis added).

H.R.Rep. No. 493, 95th Cong., 1st Sess. 105 (1977). In a listing of "Major Changes During Conference and Legislative History" reported on July 21, 1977, the Congress stated with respect to the prime farmlands provisions of the Act:

> The conferees worked long and hard to come up with a workable and meaningful provision to protect mine farmlands. The provision in the conference report is a good, workable provision. It is not a moratorium. All existing operations are grandfathered. . . .
>
> .    .    .    .    .
>
> Concern has been expressed about the impact of the permit approval or denial test pertaining to prime farmlands on existing operations.
>
> The exclusion pertains to existing mines, permits or renewals thereof after the date of enactment.

123 Cong.Rec. 24420 (1977). Similarly, the Summary of Provisions to Protect Prime Farmlands, introduced on the same day, states: "This provision (Section 510(d)) pertains only to permits issued after the date of enactment for new mining operations." 23 Cong.Rec. 24422 (1977).

Finally, a colloquy between Senator Metcalf and Senator McClure during the floor debates on the Act further clarifies Congressional intent underlying the grandfather exemption. Mr. McClure asked for an interpretation of Section 510(d):

> The conference report explains that this exclusion for existing mine permits or renewals thereof after the date of the enactment was designed to assure continued operation of ongoing mines.
>
> I am in complete accord with the expressed intention of the provision and merely wish to confirm my understanding of its purpose and effect. Am I correct that the exclusion will apply to continued operation of an ongoing mine beyond the acreage and time covered in the existing permit at the time of the enactment of the act, just so long as the continuance does, in fact, constitute a continued operation of an ongoing mine.

Mr. Metcalf stated in reply, "Yes. I say to the Senator from Idaho that that would be my interpretation of this clause." 123 Cong.Rec. S12,442 (daily ed. July 20, 1977).

A contrary interpretation offered by Senator Tsongas noting that "the conferees never contemplated that such grandfathered operations would be given the right to contiguous or noncontiguous expansions that were not specified or authorized in the originally and grandfathered permits" [123 Cong.Rec. H7588–89 (daily ed. July 20, 1977)] is an anomaly in the legislative history, and has been rejected by the court of

---

**19.** During the Conference Committee discussions concerning the scope of the grandfather clause, Congressman Seiberling objected to the otherwise unrestricted language in the proposed exemption stating:

> On Amax Mines alone (an Indiana operation), they will be able to continue mining up to 27 years if renewals of existing permits is included and would affect a total of 19,000

acres of prime agricultural land which would be exempt from the provisions of this Section. I think we did more than we should have done and we need some sort of limitation.

Conf. Markup H.R.2, 95th Cong., 1st Sess. 25 (1977). Despite the admonition of Congressman Seiberling, no limitation was drafted by the Conferees.

appeals. 627 F.2d at 1362. The court of appeals found that "[T]he statement of Congressman Tsongas directly conflicts with other indications in the legislative history of the development of the grandfather exemption and also contradicts the express words of the statute insofar as he omits reference to permit 'revisions or renewals.'" *Id.*

The Act itself, and the legislative history set forth above, clearly indicate that the grandfather clause is without a temporal limit. The statute and the history are coherent and compatible and inconsistent with the administrative appending of cutoff date on the grandfather exemption.

In his preamble accompanying promulgation of the cut-off date, the Secretary does not refer to the statutory language, or to legislative history supporting his position. After describing the legislative history as conflicting, the Secretary refers to post-enactment actions of Congress as sustaining the cut-off date. The Secretary stated:

> Since the passage of the Act, the Senate has moved to amend it and specifically to include a grandfather exemption cut-off date of August 3, 1982, under Senate Bill 2122 [96th Cong., 2d Sess., August 22, 1980; 126 Congressional Record S11398, daily ed.]. Congressional committees and individual Congressmen lent support to this effort and have expressed their desire to have a prime farmland grandfather cutoff date. Most importantly, the Senate's vote of 84 to 1 on August 22, 1980, to impose a 1982 cutoff date under S.2112, is evidence of Congress' interpretation of the grandfather clause.

47 Fed.Reg. 32940–41 (1982). However, the vote referred to in the preamble was taken during Senate consideration of a bill whose prime goal was to free states from certain provisions of the Act provided they enacted environmental performance standards as stringent as those found in the Act. Opponents of the bill submitted a large number of amendments to impede its passage. The sponsors of the bill compromised, accepting two substantive amendments, including the prime farmlands exemption, without discus-

sion or debate. [126 Cong.Rec. S11390–1401 (daily ed. August 22, 1980)]. Subsequently, the bill was sent to conference and the amendments were deleted.

The court of appeals, sitting *en banc* in an earlier case addressing the Secretary's authority to enforce specific provisions of the Act, addressed this precise legislative episode. *In re Permanent Surface Mining Regulation Litigation,* 653 F.2d 514, 521 n. 11 (D.C.Cir.1981), *(en banc) cert. denied,* 454 U.S. 822, 102 S.Ct. 106, 70 L.Ed.2d 93 (1981). In that case industry appellants argued that the Senate's passage of a bill that would have freed states from their obligation to conform to the Secretary's regulations was "entitled to some consideration" in proving what Congress meant when it first enacted the Surface Mining Control and Reclamation Act. *Id.* The court of appeals dismissed this argument stating, "[W]e agree that the intent of the 95th Congress is determinative in interpreting the Act as passed in 1977; evidence of that intent is not to be sought in actions taken or not taken by subsequent Congresses." *Id.* citing *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974).

In sum, it does not appear that the subsequent Congressional attempts to amend the Act supports the Secretary's regulation. Indeed, the attempted amendment more clearly indicates that Congress recognized that a statutory amendment was necessary to alter the grandfather provision. Such an amendment was not adopted.

The Secretary argues, however, that his action is consistent with the earlier court of appeals' decision rejecting the prior OSM regulation which limited section 510(d)(2). Emphasizing that the court of appeals rejected the prior regulation, in part, because the regulation treated state operations nonuniformly, the Secretary asserts that the instant regulation serves the interests of uniformity. The Secretary stated, "The cutoff date insures that all mining operations will be required to meet the same standards, it will reduce the potential variation in the application of the law in differ-

ent States, and it will provide certainty to the public and the industry with regard to the scope of the prime farmland exemption." 47 Fed.Reg. 32941 (1982). The Secretary has misinterpreted the court of appeals' decision.

As already noted, the court of appeals in *In Re Surface Mining Regulation Litigation,* 627 F.2d 1346, invalidated the attempt by the Secretary to narrow the statutory grandfather exemption by limiting grandfather rights to the first two clauses of section 510(d)(2). Judge Robb's opinion for the court established that the third clause of section 510(d)(2) embracing "any surface mining operations for which a permit was issued" must be given a reading apart from the first two, by grandfathering operations which are based on a pre-enactment permit but which were not explicitly covered by a permit, or a renewal or revision thereof. *Id.* at 1362. The court recognized that the purpose of the third clause was to prevent technicalities such as short permit terms or the absence of renewal or revision procedures in some states from interfering with Congressional intent to assure the continued operation of ongoing mines. *Id.* at 1361.

The validity of a cut-off date applicable to all of section 510(d) was not before the court, nor can the court's decision be read as requiring that all provisions of the grandfather exemption must affect states uniformly. The court did not hold that the grandfather exemption must be interpreted so that all mines, in all states, must end on the same date if they were unable to comply with the prime farmlands provisions of the Act. The court held that, in order that the third clause of section 510(d)(2) not be rendered a nullity, the term "existing surface mining operation" must include some acreage and time not within original state permits. This narrow holding did level the effects of section 510(d) across states, but cannot be read to require that grandfather rights terminate everywhere on April 3,

1983. The holding actually *extended* grandfather rights to states like Indiana that did not issue renewed permits, to enable lands not covered by permit to be grandfathered. 627 F.2d 1362. The court of appeals admittedly acted in the interests of uniformity. But to translate that holding into a judicial sanctioning of a cut-off date, and to ignore operator reliance upon different state permit requirements, or the diversity of minable lands among states, would raise concerns for uniformity above those for equity.

Immediately prior to the oral argument in this case,[20] the Secretary advanced one final justification for the regulation. The Secretary stated that the permits, revisions, or renewals granted by prior state law terminate automatically when the permanent regulatory program becomes effective.[21] Thus, according to the Secretary, when the permanent program becomes effective, all operations lasting beyond eight months after the date of effectiveness of the permanent program must apply for and obtain a new permit issued pursuant to the provisions of the Act. Therefore, the argument continues, any permits or renewals or revisions issued pursuant to state law terminate immediately upon issuance of a permanent program permit. Under the Secretary's reasoning, a prior permit would become a new permit upon approval of a state or federal program. Thus a termination date is actually superfluous and unnecessary because the old state permits terminate automatically.

This argument has never been advanced before by the Secretary. In the notice and comment period preceding each proposed promulgation of the cut-off date the Secretary failed to articulate this purpose for the regulation. In fact the Secretary's prior unvarying interpretation of the first two clauses of section 510(d) has been that land covered by state permits in existence on August 3, 1977 or renewals of revisions of

---

**20.** Secretary's Reply at 1–9.

**21.** The permanent regulatory program becomes effective upon approval of a state program (30

U.S.C. § 1253) or implementation of a federal program (30 U.S.C. § 1254).

these permits would continue to be grand-fathered after the permanent program was in place and a new permit had been issued. In its January 23, 1981 preamble to the final regulations the Secretary described his regulations, directed to both the interim and permanent programs, and explained the operation of the regulations as they implement the first two clauses of § 510(d)(2):

First, the proposed regulations grandfathered lands included in permits prior to August 3, 1977. This proposal corresponds to the first of the three statutory clauses in Section 510(d)(2). Second, the proposed regulations grandfathered permitted lands if the permits were 'renewed' or 'revised' within the meaning of the Act.

. . . . .

The final rules exempt all lands included in pre-August 3, 1977, permits and all revisions or renewals of those permits. 46 Fed.Reg. 7894–95 (1981).

The Secretary has always agreed that the grandfather exemption remains after the permanent program is in effect, and indeed the lengthy and detailed preamble to the current regulations does not raise this novel argument in its catalogue of supporting justifications. 47 Fed.Reg. 32939–42 (1982). Indeed, if the first clauses of the grandfather exemption terminated upon initiation of the permanent program then the Secretary would have no need to implement the exemption in the permanent program regulations. 30 C.F.R. § 785.17(a)(1) and (2). Neither Congress, nor the court of appeals, nor the Secretary prior to August 27, 1982, has suggested that the statute has imbedded in its structure an automatic termination of grandfather rights.[22] Indeed, the legislative history of the Act clearly indicates that the grandfather clause is intended to exempt mines operating at the time of the Act. The Secretary's interpretation is not only internally inconsistent, but is in-consistent with the legislative history of the Act.

An appropriate Judgment and Order accompanies this Memorandum Opinion.

## JUDGMENT AND ORDER

This matter comes before the court on cross-motions for summary judgment made by plaintiffs Peabody Coal Company, National Coal Association and American Mining Congress, and defendant James G. Watt, Secretary to the Interior, and defendant-intervenor, National Wildlife Federation. After considering all the materials submitted by the parties, together with oral arguments on this matter, and for the reasons set forth in the accompanying Memorandum, it is, by the court this 3rd day of December 1982,

ORDERED that the plaintiffs' motion for partial summary judgment challenging the adoption on January 23, 1981 of 30 C.F.R. § 785.17(a)(3)(iii) (permanent regulations) and 30 C.F.R. § 716.7(a)(2)(iii)(B) (interim regulations) limiting the grandfather exemption for existing surface mining operations to lands for which the permittee had "a legal right to mine", is denied; and it is further

ORDERED, ADJUDGED and DECREED that defendant's motion for partial summary judgment requesting that this court find that the promulgation of the above-noted regulations was reasonable and consistent with the requirements of the Surface Mining Control and Reclamation Act of 1977, is granted.

---

**22.** *See, e.g., FPC v. Texaco,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). "[W]e cannot "accept appellate counsel's post hoc rationalizations for agency action"; for an agency's order must be upheld, if at all, "on the same basis articulated in the order by the agency itself, quoting *Burlington Truck Lines,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).